RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LEWIS RHINEHART and DAVID L. RHINEHART, Joint Personal Representatives for the Estate of Kenneth A. Rhinehart,

*Plaintiffs-Appellants*,

*v.*

DEBRA L. SCUTT, Warden,

*Defendant*,

ADAM EDELMAN, M.D.; VERNON STEVENSON, M.D.,

*Defendants-Appellees*.

No. 17-2166

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-11254—Stephen J. Murphy, III, District Judge.

Argued: May 4, 2018

Decided and Filed: June 28, 2018

Before: MOORE, THAPAR, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paul J. Zalewski, THE ZALEWSKI LAW FIRM, Warren, Michigan, for Appellant. Kevin A. McQuillan, CHAPMAN LAW GROUP, Troy, Michigan, for Appellees. **ON BRIEF:** Paul J. Zalewski, THE ZALEWSKI LAW FIRM, Warren, Michigan, for Appellant. Kevin A. McQuillan, Ronald W. Chapman, Carly Van Thomme, CHAPMAN LAW GROUP, Troy, Michigan, for Appellees.

BUSH, J., delivered the opinion of the court in which THAPAR, J., joined, and MOORE, J., joined in part. MOORE, J. (pp. 41–55), delivered a separate opinion concurring in part and dissenting in part.

---
**OPINION**
---

JOHN K. BUSH, Circuit Judge.  The Eighth Amendment bars the "inflict[ion]" of "cruel and unusual punishments."  U.S. Const. amend. VIII.  This case addresses how that constitutional provision applies to the medical treatment rendered by two prison doctors to an inmate who suffered from end-stage liver disease ("ESLD").

Kenneth Rhinehart ("Rhinehart"), then a prisoner, filed this action under 42 U.S.C. § 1983, alleging that medical providers associated with the Michigan Department of Corrections ("MDOC") denied him necessary treatment for his ESLD.  When he died, his brothers, Lewis and David Rhinehart (the "Rhineharts"), filed an amended complaint on behalf of his estate.  After defendants filed motions to dismiss and motions for summary judgment, only the Rhineharts' Eighth Amendment claims against Dr. Adam Edelman and Dr. Vernon Stevenson (the "Defendant Doctors") remained.  The district court granted summary judgment to the Defendant Doctors, and the Rhineharts appealed.  For the reasons below, we AFFIRM the judgment of the district court.

I.

In the summer of 2009, Rhinehart was an inmate at Alger  Maximum Correctional Facility ("Alger") in Munising, Michigan.  He was 58 years old but in poor health.  He had been suffering from many medical conditions, including liver disease, and for the past four years, he had been experiencing general malaise, weight loss, and poor appetite.   In August 2009, his prison doctor, Aster Berhane, ordered a CAT ("CT") scan of his abdominal area, which revealed a suspicion of bile duct cancer.  The parties agree that Rhinehart did not in fact have cancer then or at any other time before his death.

But that was unknown in the fall of 2009, so Dr. Berhane arranged to transfer Rhinehart downstate for further investigation of this potential cancer.  She contacted defendant Dr. Edelman about transferring Rhinehart to Cotton Correctional Center ("Cotton").  Dr. Edelman

was the medical director for utilization management at Corizon Health Inc. ("Corizon"),[1] a company responsible for on-site medical services for all state inmates. He studied internal medicine, but his experience was mainly administrative. His job was to review requests for outside treatment, which other medical providers generally submitted on a form called a 407. Such requests were necessary for a prisoner to be referred to a specialist within Corizon's referral network.

Dr. Berhane arranged an expedited, doctor-to-doctor transfer from Alger to Cotton.[2] She also submitted a 407 request to refer Rhinehart to an oncologist (cancer specialist) or hepatologist (liver specialist) for a biopsy of the potential cancer. Dr. Edelman approved the referral request.

Around that same time, Dr. Berhane also contacted defendant Dr. Stevenson—a general internist doctor, Corizon employee, and the senior doctor on staff at Cotton—to inform him about Rhinehart's medical issues. During his deposition, Dr. Stevenson testified that he understood that Rhinehart had "very urgent issues" and needed to be seen by a specialist for abnormal liver findings. R.263-3, Stevenson Dep., Page ID# 5025–26.

The Rhineharts presented evidence that the Cotton facility assigned inmates to doctors based on their prison number, and that generally, an assigned doctor was responsible for developing an inmate's treatment plan and examining that inmate (unless the doctor was unavailable to do so). Rhinehart's prison number revealed that he was assigned to Dr. Stevenson.[3]

---

[1]Corizon was previously called Prison Health Services.

[2]During his deposition, Dr. Edelman did not recall Dr. Berhane's discussion with him about Rhinehart, but he acknowledged that it was uncommon for an on-site medical provider to call him when beginning a referral request.

[3]Dr. Stevenson contests this. He testified that Rhinehart was never completely his patient.

Rhinehart was transferred to Cotton on October 26, 2009, but saw no doctor until about two months later. This delay is attributable to a failure by the nursing staff at Cotton in processing Rhinehart's intake and scheduling him for a medical-provider visit.[4] During the time that Rhinehart had not seen a doctor, he filed complaints and grievances expressing concern about not being referred for a biopsy of his liver to determine his cancer risk. He also asked to see a doctor because of increasing pain in his liver and abdominal area and consequent difficulty in performing his porter job.

Dr. Stevenson testified that he did not receive notifications of inmate complaints or copies of grievances. But he recalled that in mid-December 2009, Cotton's Health Unit Manager, Beth Gardon, told him that Rhinehart had been at Cotton for six weeks and had not been seen for an intake. Upon hearing this, Dr. Stevenson directed Gardon to bring Rhinehart in for an appointment. The Cotton staff scheduled Rhinehart to see Dr. Stevenson three weeks later. When it came time for Rhinehart's appointment, however, Dr. Stevenson was too busy, so he arranged for another doctor, Dr. Padmaja Vemuri, to examine Rhinehart.[5]

From early January until the end of February 2010, Rhinehart had several appointments with prison medical providers but none with Dr. Stevenson. Dr. Vemuri first examined Rhinehart on January 4, 2010; he complained about weight loss and discomfort in his liver area.[6] Dr. Vemuri noted that a request for Rhinehart to be referred to an oncologist had already been approved, and she set forth a plan to have the oncology appointment made, to have laboratory testing conducted, and for Rhinehart to have an appointment with the gastrointestinal clinic.[7] After this appointment, Rhinehart attended several more doctor appointments in January 2010 with

---

[4]The Rhineharts sued several Cotton nurses, but the claims against them were dismissed and are not at issue.

[5]The Rhineharts sued Dr. Vemuri, but the claims against her were dismissed and are not at issue.

[6]Rhinehart alleged in a grievance that Dr. Vemuri did not have his medical file at the time of the examination. In her deposition, Dr. Vemuri admitted that this was probably true.

[7]The day after Rhinehart's appointment with Dr. Vemuri, Dr. Stevenson completed a request for Rhinehart to undergo a liver biopsy. But Dr. Stevenson's biopsy request was never granted.

Dr. Vemuri and another prison doctor, Dr. Zivit Cohen.[8]  On February 3, 2010, Dr. Cohen obtained approval for an ultrasound of Rhinehart's liver, which was completed about a week later.

Rhinehart was not satisfied with the care that he had received.  He filed a grievance related to his first appointment with Dr. Vemuri in which he stated that he was experiencing severe pain and she failed to prescribe him pain medication.  After that, he sent letters of complaints to medical and legal officials and filed a pro se lawsuit raising his concerns about his risk for cancer and the lack of care he was receiving.

Rhinehart's grievance for lack of pain medication was upheld on January 22, 2010.  A little less than a month later, Dr. Cohen saw him for his complaints of abdominal discomfort and prescribed him pain medication.

Shortly after that appointment, a Jackson, Michigan  newspaper ran an article reporting that Rhinehart  probably had cancer and was in pain but had not been given a referral to a specialist, a liver biopsy, a treatment plan, pain pills, or an explanation for  the delay.  The article was followed by a call  from the ACLU to the Michigan Attorney General's Office.  This call resulted in a few internal emails among prison medical staff that showed some confusion about whether Rhinehart's cancer risk had been ruled out.

Three days after this exchange of emails, on February 25, 2010, Dr. Stevenson and Dr. Eddie Jenkins (the Regional Medical Director) examined Rhinehart.  Rhinehart complained of abdominal pain, nausea, bilateral  back and flank pain, blood in his urine, and a decreased urine stream.   Dr. Stevenson "reassured" Rhinehart that he had no  mass or cancer, ordered urine and laboratory tests, and scheduled a follow-up appointment in three weeks.

After that, Dr. Cohen monitored Rhinehart.  She regularly examined him, ordered laboratory tests, and treated his pain.  On March 8, Dr. Cohen saw Rhinehart for his ESLD.  Dr. Cohen conducted a physical exam and noted improvements, including that he presented with an "okay" appetite, stable weight, and a reduction in his pain under the prescribed pain medication. In April, Rhinehart had additional follow-up appointments.  Dr. Cohen conducted another full

---

[8]The Rhineharts did not sue Dr. Cohen.

examination, prescribed Ensure, ordered lab work, and scheduled a one-month follow-up appointment. Then in May, Dr. Cohen gave Rhinehart a detail for a "light duty" work assignment to accommodate his pain. And when Rhinehart reported increased pain, Dr. Cohen prescribed methadone for him, which, during his May follow-up appointment, Rhinehart reported was working well.

But that summer, Rhinehart's condition took a turn for the worse. On June 20, 2010, about eight months after his transfer to Cotton, the Cotton medical staff transferred Rhinehart to the emergency room of Allegiance Hospital. The Cotton staff sent him there because he had been complaining of bloating, increased pain in his spleen/liver, general malaise, and fatigue. At the hospital, he presented with constipation, hallucinating, and abdominal pain. He was admitted and treated until his discharge on June 30, 2010.

A brief review of the Rhineharts' medical literature and expert testimony is necessary here. Liver disease can lead to cirrhosis of the liver—the deterioration of the liver when scar tissue replaces healthy liver tissue. Cirrhosis causes increased pressure in the veins that carry blood to and from the liver. This increased blood pressure can cause the formation of dilated veins in the esophagus, esophageal varices. These varices carry the risk of bleeding, a risk that increases along with the pressure and sizes of the varices. One way for a specialist to diagnose esophageal varices is by inserting a scope into the esophagus—a procedure known in the medical field as Esophagogastroduodenoscopy ("EGD") scoping. When esophageal varices are found, "first level" treatment includes prescribing medications such as beta blockers (which decrease blood pressure), EGD scoping and ligation banding performed by a specialist (which obliterate the varices), or some combination of both.

After Rhinehart was admitted into the hospital, he underwent a series of tests, including a CT scan of his abdomen with contrast, an MRI, and an ultrasound. These tests revealed no liver mass but extensive portal venous thrombosis (blood clotting in the vein that carries blood to the liver). His hospital records show that "no definitive intervention was felt to be indicated other than beta blockers and an EGD to rule out/assess esophageal varices." R.259-2, Discharge Summary, Page ID# 4706. Dr. Lynn Schachinger, a hospital gastroenterologist, performed an EGD, which

revealed four columns of esophageal varices with no active bleeding; he successfully placed seven ligation bands to obliterate the varices.

In his post-procedure report, Dr. Schachinger recommended that Rhinehart "followup [sic] as an outpatient with the prison gastroenterologist for additional EGD with esophageal banding as necessary." R.177, Endoscopy Report, Page ID# 2421. In his deposition, Dr. Schachinger testified that "the risk of [Rhinehart's] bleeding from [his varices] was higher because of the size of the varices" and that if he had a patient with Rhinehart's conditions under his exclusive control, he would have reevaluated Rhinehart's varices a month later. R.263-13, Schachinger Dep., Page ID# 5399–4000. He also testified that he "probably would have referred [such a patient] to a tertiary care center that performs a liver transplant to see if at some point that might become necessary," but emphasized that the decision to order a transplant would be "up to the hepatologist" as "they deem necessary." *Id.* at 4000. The Rhineharts' expert witness, gastroenterologist Dr. Stuart Finkel, agreed. In his deposition, he testified that in the weeks and months after Rhinehart's June 2010 hospitalization, "[i]n the private world setting, Dr. Schachinger would have recalled the patient in a timely fashion for a repeat [EGD] and banding session." R.263-14, Finkel Dep., Page ID# 5442. He also agreed with Dr. Schachinger's opinion that he would have referred Rhinehart for evaluation for a liver transplant. *Id.*

The day after his discharge from the hospital, Dr. Cohen saw Rhinehart. She reviewed his hospital records, ordered lab work, prescribed a beta-blocker medication (Propranolol) to reduce his blood pressure, and scheduled a one-week follow-up appointment. Rhinehart was not referred for follow-up appointments with a gastroenterologist. Instead, Dr. Cohen continued to monitor Rhinehart that month, examining him on July 8 and again on July 19.

The next month, August 2010, Dr. Stevenson left his employment with Corizon.[9] At that time, Dr. Edelman was still working for Corizon, but he did not become re-involved in Rhinehart's healthcare until May 17, 2011.

---

[9]Dr. Stevenson's last involvement in Rhinehart's case was on August 7, 2010, when a prison nurse informed him that Rhinehart had reported shortness of breath. Dr. Stevenson directed her to continue monitoring Rhinehart and to provide him with inhaler breathing treatments.

In June 2011, the Cotton medical staff again sent Rhinehart to Allegiance Hospital's emergency room after he complained of increased abdominal pain. R.178, Progress Note, Page ID# 2437–40. An MRI showed "progression of disease on comparison with previous imaging from June of 2010." *Id*. at Page ID# 2437. A CT-guided biopsy was negative for a malignancy. The gastroenterologist's discharge plan included a repeat MRI of Rhinehart's abdomen in four weeks and, if Rhinehart's tumor worsened, an evaluation at a tertiary care center. *Id*. at Page ID# 2437, 2439. Dr. Edelman approved the request for Rhinehart to have an MRI of his liver on July 5, 2011. The results were unchanged in comparison to the MRI completed a month earlier. The MRI also showed blockage of the portal vein (the vein that carries blood to the liver). After Rhinehart had blood drawn, Dr. Nancy McGuire, who was now Rhinehart's medical provider, discussed his case with Dr. Edelman.

Around this same time, Rhinehart had moved for a temporary restraining order requesting that he be seen by a hepatologist, oncologist, or qualified liver specialist to be evaluated for a liver transplant—the only curative treatment option for ESLD.[10] In responding to the motion, Dr. Edelman and Dr. Kosierowski (an oncologist and Corizon consultant) signed affidavits. They declared that they had discussed Rhinehart's case and had determined that there was no need to send Rhinehart to a specialist. R.258-4, Affidavits of Dr. Edelman and Dr. Kosierowski, Page ID# 4500–09. Both Dr. Edelman and Dr. Kosierowski stated in their affidavits that Rhinehart likely did not have cancer.[11] *Id.* As for a liver transplant, they avowed that Rhinehart was an unlikely candidate. *Id.* In his affidavit, Dr. Edelman explained how liver transplants are assigned and why Rhinehart was not realistically eligible to receive one:

> Liver transplants are judged by the Model for End-State Liver Disease (MELD) system to prioritize patients waiting for a liver transplant. The range is from 6 (less ill) to 40 (gravely ill). The individual score determines how urgently a patient needs a liver transplant within the next three months. The number is calculated using the most recent laboratory tests. Mr. Rhinehart, based on his

---

[10]That motion was ultimately denied, and this court affirmed. *See Rhinehart v. Scutt*, 509 F. App'x 510, 516 (6th Cir. 2013).

[11]Both doctors also noted that Rhinehart was scheduled for an open liver biopsy. That biopsy, conducted in September 2011, again confirmed that Rhinehart did not have cancer.

most recent laboratory tests, would likely score very low on the scale and therefore would not be considered for transplant at this time.

*Id.* at 4507–08.

In his deposition years later, Dr. Finkel disputed Dr. Edelman's and Dr. Kosierowski's opinions about Rhinehart's eligibility for a liver transplant. He opined that "livers are allocated to patients who are in the worst condition. And then, if nobody is available who is a match, it goes down the line to better candidates. Maybe he would have received a liver, maybe he wouldn't have received a liver, but he would have been a candidate." R.263-14, Finkel Dep., Page ID# 5442. Dr. Finkel admitted that Rhinehart's MELD score of 7 (out of 40) "would not have placed him at the top of the list for [a] liver transplant" but opined that "contrary to Dr. Edelman's testimony, it would not have eliminated him or knocked him out of contention." *Id.* Dr. Finkel also testified that because Rhinehart had such a low MELD score, he "probably would have done very well with a liver transplant." *Id.*

On October 12, 2011, Dr. Edelman had a telemedicine appointment with Rhinehart. During the appointment, Dr. Edelman rejected Rhinehart's request to see an outside liver specialist for evaluation for a liver transplant. He reiterated that based on Rhinehart's blood work, his liver health was too good for him to qualify, and Dr. Edelman assured Rhinehart that the prison medical staff could provide his necessary treatment.

Two weeks later, on October 26, 2011, Rhinehart was rushed to Allegiance Hospital after he reported abdominal pain and vomiting large amounts of blood. Dr. Schachinger performed an emergency EGD, discovered four columns of severe esophageal varices that were bleeding, and successfully treated them with ligation banding. At his deposition, Dr. Schachinger testified that if Rhinehart's varices had been monitored after the first banding procedure in June 2010, and if additional banding had occurred, it was possible that this bleed could have been prevented. Dr. Finkel agreed. In his deposition, he opined that the likelihood of Rhinehart's esophagus bleeding in October 2011 "would have been reduced or eliminated entirely" if Dr. Schachinger's recommendation for follow-up gastroenterologist appointments in June 2010 were followed. R.263-14, Finkel, Dep., Page ID# 5441.

After treating Rhinehart in October 2011, Dr. Schachinger laid out a recommended plan of care in his post-procedure report. One of his recommendations was that Rhinehart's prison doctors transfer him to a tertiary care institution to undergo a transjugular intrahepatic portosystemic shunt ("TIPS") procedure, which is used to decompress the pressure in the portal vein to decrease the risk of esophageal bleeding. R.259-2, Endoscopy Report, Page ID# 4713. He recommended that "the transfer should occur if [Rhinehart] has additional bleeding" because more banding would not be an option. *Id.* He summarized Rhinehart's condition: "The patient's prognosis is quite poor and guarded at this time and there is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred." *Id.*

In his deposition, Dr. Schachinger testified that he recommended that Rhinehart's healthcare providers "consider a TIPS procedure" because it was "medically . . . the right move," as Rhinehart had severe varices, which had bled, and a TIPS has been shown to decrease his risk of bleeding. R.263-13, Schachinger Dep., Page ID# 5403. He opined that this procedure would have stopped esophageal bleeding. *Id.* But he also recognized that there are serious risks in performing a TIPS, including a chance of the patient developing brain disease. *Id.* at Page ID# 5407.

Dr. Finkel testified that a TIPS is the "gold standard" of treatment for patients with esophageal varices. R.263-14, Finkel Dep., Page ID# 5435. He opined that a TIPS is "a minimally invasive procedure," that a patient with Rhinehart's MELD score would "have a 100 percent chance of survival following [a] TIPS for the first year," and that Rhinehart "had the potential of living for another five years without a liver transplant" had he received the TIPS. *Id.* at Page ID# 5440. Dr. Finkel recognized a risk of hepatic encephalopathy—a form of brain disease—from a TIPS procedure but estimated Rhinehart's risk at "less than 20 percent." *Id.*

The day after Rhinehart's esophageal banding, a hospitalist, Dr. Mohmmed Al-Shihabi, contacted Dr. Edelman and Dr. Stieve about the possibility of transferring Rhinehart to a tertiary center for an evaluation and possible TIPS procedure. R.259-2, Progress Note, Page ID# 4715–16. In his report, Dr. Al-Shihabi wrote that Dr. Edelman "denied this transfer and he said that we just need to continue monitoring the patient here, even though Dr. Schachinger said that if the patient bleeds he cannot do to [sic] anything and the patient will be unstable to be transferred or

do anything and the patient will definitely die." *Id.* at 4715. Dr. Al-Shihabi noted that Dr. Stieve also denied the transfer. *Id.*

In his deposition, Dr. Edelman testified that he had "denied the transfer because [he] talked to Dr. Stieve about it." R.263-2, Edelman Dep., Page ID# 5001. Indeed, in an internal administrative progress note, Dr. Stieve explained that he and Dr. Edelman discussed the merits of transferring Rhinehart for a TIPS evaluation. R.259-1, Progress Note, Page ID# 4689. According to Dr. Stieve's note, the doctors recognized that a TIPS could reduce a "hypothetical" risk of re-bleed but that the procedure would not prolong Rhinehart's life and came with an increased risk of brain disease. *Id.*

During his deposition, Dr. Stieve discussed his familiarity with the medical issues involved in the decision. He testified that he dealt daily with patients who had esophageal varices and that "[e]sophageal varices banding was a very common thing for me to be involved with[.]" R.340-1, Stieve Dep., Page ID# 8589. He likewise testified that he "had been involved with approving other TIPS procedures for other inmates," but considered those inmates to have "different circumstances" because "[t]hey were being released so that they could get a liver transplant." *Id.* at Page ID# 8590, 8589 ("I would often evaluate inmates to see whether they were a candidate for a TIPS procedure"). And although he conceded that he was not a gastroenterologist, radiologist, or hepatologist, he could explain how TIPS and banding procedures were performed and what they entailed. *Id.* at Page ID# 8589–90.

Dr. Stieve testified that he and Dr. Edelman disapproved transferring Rhinehart for evaluation for a TIPS because he "was stable, hadn't rebled, and we had a treatment plan that we thought would be effective in controlling further bleeds, that giving nonspecific beta-blocker therapy and 24 hour health care surveillance, which is available in all of our prisons." *Id.* at Page ID# 8613. He emphasized that Dr. Schachinger recommended that the transfer occur "if he has additional bleeding, and I have no evidence that after he performed the banding there was any additional bleeding." *Id.* at Page ID# 8608, 8612. And he testified that he and Dr. Edelman agreed that "[i]f the patient had needed the TIPS procedure, we would have agreed on it and approved it but neither one of us thought that [a TIPS] was an appropriate procedure at that particular clinical junction." *Id.* at Page ID# 8590.

In February 2012, a few months after denying the request for a TIPS-procedure consult, Dr. Edelman left Corizon. Almost a year later, in January 2013, Rhinehart slipped and fell on a wet surface and broke his hip. Rhinehart agreed to undergo surgery to repair the injury, but unfortunately, he did not survive the recovery. He died of a morphine overdose in February 2013 because his liver could not metabolize the morphine used to control his pain. He suffered no esophageal bleed between October 2011 and his death.

## II.

This action began on March 29, 2011, when Rhinehart filed a pro se lawsuit alleging that his medical providers were ignoring his pain, fear of cancer, and his desire to receive a liver transplant. The district court denied his emergency injunctive motions, and this court affirmed. *See Rhinehart*, 509 F. App'x at 516. Soon after, Rhinehart passed away, and his brothers (as joint personal representatives of his estate) then filed an amended complaint.

The Defendant Doctors moved for summary judgment on the Rhineharts' claims of deliberate indifference to Rhinehart's serious medical needs. The magistrate judge issued a Report and Recommendation to deny summary judgment, and the district court adopted the Report and Recommendation in full.

About a year later, with the case going on to trial, the Defendant Doctors raised a *Daubert* challenge against Dr. Finkel. They objected to Dr. Finkel's testifying about Rhinehart's alleged fear of cancer and pain and suffering from not being evaluated for a TIPS procedure. The district court granted the motion in part. It decided that Dr. Finkel could testify "consistent with his expertise," about "Rhinehart's fears" because "any emotional or physical harm he suffered as a result of their indifference is relevant to the damages Plaintiffs seek." But the court precluded testimony on whether "Rhinehart suffered physical pain due merely to hypertension" because "[n]one of the materials before the Court . . . assures the Court that [Dr.] Finkel's opinion [on that topic] is based upon sufficient facts and reliable methods." The district court ordered the Rhineharts to give "one day's notice before calling Finkel" to testify so that the court could hold "a short hearing" on "precisely what Finkel intends to offer and to make any necessary rulings that will curb impermissible testimony."

While the *Daubert* motion was still pending, the Defendant Doctors filed their second motion for summary judgment. They argued that this court's decision in *Mattox v. Edelman* clarified the requirements for establishing a deliberate-indifference claim based on a medical need that "has been diagnosed by a physician as mandating treatment." 851 F.3d 583, 598 (6th Cir. 2017). They also relied on the *de bene esse* trial depositions of Dr. Stieve and Dr. Kosierowski. After the district court ruled on the Defendant Doctors' *Daubert* motion, it granted summary judgment in their favor. *Rhinehart v. Scutt*, 2017 WL 3913333, at *1 (E.D. Mich. Sept. 7, 2017).

The district court held that because the Rhineharts' case was based on the treatments Rhinehart did and did not receive for his ESLD, they had to show "that Rhinehart's needs were diagnosed by physicians as mandating treatment and that Defendants failed to treat him or so inadequately treated him that he suffered a verified medical injury." *Id.* at *2. The court determined that at all relevant times Rhinehart received some treatment for his ESLD. *Id.* at *4–10. It rejected the Rhineharts' claims against Dr. Stevenson because they presented no "verified medical evidence" that Rhinehart suffered a harm because of Dr. Stevenson's alleged failings. *Id.* at *3–7. Similarly, the court determined that the Rhineharts failed to introduce "verified medical evidence" showing harm from either Dr. Edelman's failure to ensure that Rhinehart saw a specialist in early 2010 or his failure to refer him for evaluation for a liver transplant in October 2011. *Id.* at *7, *10–11. Finally, in addressing Dr. Edelman's denial of a specialist's request for Rhinehart to be evaluated for a TIPS procedure, the court determined that this "amounted to a mere disagreement among medical professionals" and thus did not constitute deliberate indifference to Rhinehart's serious medical needs. *Id.* at *9.

The Rhineharts appealed and challenge the district court's decisions on the Defendant Doctors' second motion for summary judgment and *Daubert* motion.

III.

We review a district court's grant of summary judgment de novo. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). Summary judgment is appropriate only when there is "no genuine dispute as to any material fact" and defendants are "entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," this Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *Id.* at 251–52, 255.

Section 1983 provides a federal cause of action against government officials who, while acting under color of state law, "deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996)).  The Rhineharts assert that the Defendant Doctors deprived Rhinehart of his constitutional rights by acting deliberately indifferent to his serious medical needs.  The Defendant Doctors do not dispute that they acted under color of state law but deny that they violated Rhinehart's constitutional rights.

The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments" against those convicted of crimes.**[12]**  U.S. Const. amend. VIII.  Incarceration is a form of criminal punishment subject to the Eighth Amendment's protections.  *See generally Howard v. Fleming*, 191 U.S. 126, 135–36 (1903).  There is a paucity of evidence from the Founding era, however, about how the Eighth Amendment was commonly understood to operate in the prison context.  Imprisonment was not a typical form of punishment in this country during the eighteenth century.  "Jails were used primarily to hold for trial people who could not make bail and for debtors who could not pay off their creditors." J. Filter, *Prisoners' Rights: The Supreme Court and Evolving Standards of Decency* 46 (2001); *see also* M. Mushlin, *Rights of Prisoners* § 1.2, at 5–6 (5th ed. 2017).  "Persons who had been convicted of crimes rarely were imprisoned; instead they were fined, whipped, placed in the stockade, banished, or hanged, depending on the

---

**[12]**In *Robinson v. California*, the Supreme Court held that the Eighth Amendment prohibition against cruel and unusual punishments applies to the states through the Fourteenth Amendment.  370 U.S. 660, 667 (1962).  Thus, prisoners may sue state prison authorities for Eighth Amendment violations.

seriousness of their offense." Mushlin at 5–6.**[13]** Because incarceration as a form of criminal punishment was not the norm, the Founding generation did not have much context in which to consider what Eighth Amendment protections, if any, existed for prisoners.

We do know from the Founding era that "the primary concern of the drafters" of the Eighth Amendment "was to proscribe 'torture[s]' and other 'barbar[ous]' methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (alterations in original) (citation omitted). Indeed, when the Supreme Court interpreted the cruel and unusual punishments language for the first time, it remarked that "it is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." *Wilkerson v. State of Utah*, 99 U.S. 130, 136 (1878); *see also O'Neil v. State of Vermont*, 144 U.S. 323, 339 (1892) (Field, J., dissenting) (describing punishments that the Eighth Amendment prohibited, such as "the rack, the thumb-screw, the iron boot, the stretching of limbs, and the like, which are attended with acute pain and suffering"). The Supreme Court later interpreted the Eighth Amendment's reach to, among other things, protect prisoners from the government's imposition of "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

How do these directives apply in today's prison context and, in particular, to the medical needs of an inmate? In *Estelle*, the Supreme Court "first acknowledged that" the Eighth Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). But because "only the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment," *id.* (internal quotation marks and citation omitted), "a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs," *id.* (quoting *Estelle*, 429 U.S. at 106). "It is *only* such indifference that can violate the Eighth Amendment." *Id.* (internal quotation marks and citation omitted). Thus, "allegations of 'inadvertent failure to provide adequate medical care,'" *id.* (quoting *Estelle*, 429 U.S. at 105), "or

---

**[13]***See also* D. Rothman, *The Discovery of the Asylum:  Social Order and Disorder in the New Republic* 48 (2d ed. 1990) (noting that eighteenth-century criminal codes would rarely "rely upon institutionalization" and that "[t]he idea of serving time in a prison as a method of correction was the invention of a later generation").

of a 'negligent . . . diagnos[is],'" *id.* (alteration in original) (quoting *Estelle*, 429 U.S. at 106), "simply fail to establish the requisite culpable state of mind," *id.*

Why is a "requisite culpable state of mind" necessary to establish in an Eighth Amendment medical-needs case? It all goes back to the text of the Eighth Amendment. Because the provision of medical care for a prisoner is not explicitly part of the sentence imposed, that care's inadequacy constitutes a "cruel and unusual punishment[]" only if the government actor, at a minimum, knew the care provided or withheld presented a serious risk to the inmate and consciously disregarded that risk. *See Wilson*, 501 U.S. at 300 ("If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify."). As a result, "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105. Instead, the government actor must act with "deliberate indifference to serious medical needs of prisoners," *id.* at 104, in order for the alleged inadequacy of care to be considered "cruel and unusual punishment[]."

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. But mere failure to provide adequate medical care to a prisoner will not violate the Eighth Amendment. In those circumstances, a constitutional violation arises only when the doctor exhibits "*deliberate indifference* to a prisoner's serious illness or injury," *id.* at 105 (emphasis added), that can be characterized as "obduracy and wantonness" rather than "inadvertence or error in good faith," *Wilson*, 501 U.S. at 299 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). To establish a prison official's deliberate indifference to a serious medical need, an inmate must show two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The plaintiff must show both that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence. *Id.* at 834–35.

A. Objective Component

The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment. *Id.* at 834. Sometimes this inquiry is a simple one. For example, because a serious medical condition carries with it a serious medical need, when prison officials fail to provide treatment for an inmate's serious medical condition, the inmate has endured an objectively serious deprivation. *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896–899 (6th Cir. 2004); *see also Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 500 (1st Cir. 2011); *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). So we have said that when an inmate had a medical need "diagnosed by a physician as mandating treatment," the plaintiff can establish the objective component by showing that the prison failed to provide treatment, *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir.1990)), or that it provided treatment "so cursory as to amount to no treatment at all," *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony . . . showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying

medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)); *cf. Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (holding that defendant had "met this requirement" at the motion-to-dismiss stage "by alleging statements by [doctors] linking the delay in treatment to the permanency of his vision impairment").

## B. Subjective Component

In addition to showing a sufficient harm, a plaintiff must show that the defendants acted with deliberate indifference. We address this subjective component individually for each defendant. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. *See Estelle*, 429 U.S. at 107–08. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." *Santiago*, 734 F.3d at 591 (citing *Farmer*, 511 U.S. at 834, 839–40). This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge. *Id.* at 842–43.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." *Cairelli v. Vakilian*, 80 F. App'x 979, 983 (6th Cir. 2003); *see Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014). A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even

harmful. *See Farmer*, 511 U.S. at 844. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." *Richmond*, 885 F.3d at 940. That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." *Id.* But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm." *Id.* (emphases added) (citation and internal quotation marks omitted).

## IV.

The Rhineharts' claims are based on Rhinehart's ESLD diagnosis. The Defendant Doctors do not dispute that Rhinehart had ESLD or that his condition required medical care. But they argue that he received constitutionally adequate medical treatment and that they did not possess the mental state necessary for Eighth Amendment liability. We address the Rhineharts' claims against Dr. Stevenson and Dr. Edelman below.

### A. Dr. Stevenson

Dr. Stevenson was a general internist doctor at Cotton and the senior doctor on staff. The Rhineharts presented evidence that he was Rhinehart's assigned doctor and that he was responsible for examining Rhinehart and developing his treatment plan. His involvement in Rhinehart's medical care occurred between late 2009 and August 2010.

The Rhineharts argue that while Rhinehart was assigned as one of Dr. Stevenson's patients the treatment he received was "so cursory as to amount to no treatment at all." *See, e.g.*, Appellants' Br. at 21, 22. The district court disagreed with this characterization of Rhinehart's care and found that he received treatment for his ESLD at all relevant times. *See Rhinehart*, 2017 WL 3913333, at *4–10. We agree with the district court; this is not a case involving cursory treatment amounting to no treatment at all.

Rhinehart's long prison medical file shows that his Cotton medical providers monitored and treated his ESLD and its symptoms, including esophageal varices and ascites. He had regular appointments with medical providers who examined him, noted his liver disease, and evaluated his symptoms. He underwent lab tests, ultrasounds, MRIs, and CT scans. His prison doctors prescribed him medication for his pain, and when he reported increased pain, his doctors prescribed stronger medication. When his condition worsened, his medical providers sent him to the hospital, where he received specialist treatment, including EGD scoping and ligation banding for his esophageal varices and paracentesis for his ascites (a process for draining accumulated fluid from the abdomen). And after his varices were discovered, he was prescribed beta blockers to reduce his blood pressure, a recognized "first-level" treatment for that condition. No reasonable jury could find that Rhinehart's ESLD treatment amounted to no treatment at all with respect to when Dr. Stevenson was involved in Rhinehart's care.[14] *See, e.g.*, *Dominguez*, 555 F.3d at 550–51 (finding that inmate's care amounted to no treatment at all when inmate presented with severe heat exhaustion and vomited during examination, but nurse provided only cursory examination and returned him to his non-air-conditioned cube with instructions to drink water and take aspirin).

Thus, the Rhineharts' claim against Dr. Stevenson is properly considered an adequacy-of-care claim. To go on to trial, they must show that there is a genuine issue of fact over the adequacy of the care Rhinehart received and that he suffered a verified medical injury because of the inadequate treatment. *See Santiago*, 734 F.3d at 591; *Blackmore*, 390 F.3d at 897–98.

In assessing the Rhineharts' claims, we must keep in mind the distinction "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)). An inmate's "disagreement with the testing and treatment he has received . . . does not rise to the

---

[14]To the extent the Rhineharts argue that Rhinehart received no treatment at all during the initial two months after his transfer to Cotton, there is insufficient evidence to conclude that Dr. Stevenson was aware of the problem until mid-December 2009. At that point, Dr. Stevenson arranged to have Rhinehart seen relatively soon thereafter. *See* R. 263-3, Stevenson Dep., Page ID# 5029–30. Thus, this argument fails on the subjective prong of the deliberate-indifference test. *See Santiago*, 734 F.3d at 592–93 (discussing limits of drawing inferences from relatively short delays or delays not in a doctor's control).

level of an Eighth Amendment violation." *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) (citing *Estelle*, 429 U.S. at 107). Nor does "a desire for additional or different treatment . . . suffice to support an Eighth Amendment claim." *Anthony*, 701 F. App'x at 464. The Rhineharts must present evidence from which a reasonable jury could find that Rhinehart's care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller*, 408 F.3d at 819 (quoting *Waldrop*, 871 F.2d at 1033).

The Rhineharts allege that Dr. Stevenson deprived Rhinehart of adequate treatment at two distinct times: (1) before his hospitalization in June 2010, when Dr. Stevenson failed to refer Rhinehart for prompt and consistent specialist care; and (2) in July and August 2010, when, after his hospitalization, a specialist recommended that Rhinehart be prescribed beta blockers and further EGD scoping and ligation banding as needed, but he instead received beta blockers and general internist monitoring and care.

i. Pre-Hospitalization

Before his hospitalization in June 2010, prison medical providers monitored Rhinehart. And when he complained of increased discomfort, he was sent to the hospital, where he received specialist treatment. The Rhineharts argue, however, that this monitoring and as-needed specialist treatment was inadequate. To go on to trial on their Eighth Amendment claim, they needed to present medical proof from which a jury could find that their proposed treatment plan—prompt and regular specialist monitoring—was necessary. *See Anthony*, 701 F. App'x at 464 ("Anthony claims that he was denied a specific type of treatment—a colostomy. Consequently, Anthony must present a medical expert who can speak to the necessity of such a treatment and evaluate it vis-à-vis the treatment he received. Because Anthony has not come forward with such medical testimony, his claim cannot succeed as a matter of law."); *Santiago*, 734 F.3d at 591 (affirming summary judgment in favor of prison medical providers because inmate's claim was based on the delay in receiving a specific type of medical treatment and he failed to show that treatment he received was inadequate).

The Rhineharts point to no medical proof that Rhinehart, or ESLD patients like him, require regular specialist monitoring and care. Their expert did not so testify, and they point to no medical articles showing that this desired treatment plan was necessary. Lacking that evidence, they argue that a jury could find that specialist treatment was necessary based on Dr. Berhane's 2009 request for Rhinehart to be transferred to another prison on an expedited basis coupled with her 407 request that Rhinehart be referred to a specialist for a liver biopsy. But neither the context of Rhinehart's transfer nor Dr. Berhane's specialist consultation request advances the Rhineharts' argument that Rhinehart needed prompt and regular specialist treatment for his ESLD.

Dr. Berhane's requests were based on a suspicious tumor, not a need for ESLD treatment. The record shows that in September 2009, after Rhinehart underwent a CT scan that revealed a high suspicion for cancer, Dr. Berhane contacted Dr. Edelman, discussed Rhinehart's medical needs, and submitted a formal consultation request. Dr. Berhane recommended that Rhinehart be approved to see an oncologist or hepatologist for a tissue biopsy of his liver. R.263-9, Consultation Request, Page ID# 5193–94. The 407 form that Dr. Berhane submitted provides: "Request consult for tissue biopsy of these highly suspicious findings for a . . . tumor." *Id.* at 5193. Of course, Rhinehart never had cancer, and the Rhineharts' Eighth Amendment claim is not based on harm caused by this tumor. Yet the Rhineharts argue that this request for a prompt specialist referral and biopsy would allow a jury to find that Rhinehart needed to see a specialist for his ESLD. But Dr. Berhane's request that Rhinehart see a specialist to evaluate his potential cancer says nothing about a need for ESLD treatment. The 407 listed ESLD under "Presumed Diagnosis" but never mentioned any need for Rhinehart to see a specialist for treatment for his ESLD. *Id.* In sum, Dr. Berhane's requests do not support the Rhineharts' claim that prompt and regular specialist treatment was necessary.

Without evidence that Rhinehart's ESLD required regular specialist monitoring, the Rhineharts argue that Rhinehart's ESLD included a "high" probability of his developing esophageal varices and that this condition can be discovered by EGD scoping, which can be done by only a specialist. Thus, they argue, Rhinehart required prompt and regular specialist care to

monitor for esophageal varices, and because he did not receive it, a jury could find that his treatment was inadequate.

But the fact that esophageal varices can be diagnosed by EGD scoping does not establish that specialist monitoring and EGD scoping were "medical necessit[ies]" when Rhinehart was transferred to Cotton. *Anthony*, 701 F. App'x at 464. For starters, the Rhineharts' medical literature explains that these treatments constitute only one method for discovering varices, along with x-rays and lab tests. R. 315-3, Medical Lit., Page ID# 7803. Rhinehart saw his prison doctors regularly and underwent several lab tests. And when Rhinehart complained of increasing discomfort in June 2010, his prison medical providers transferred him to the hospital, where his esophageal varices were discovered during an EGD scoping procedure. Allegations "that more should have been done by way of diagnosis and treatment" and "suggest[ions]" of other "options that were not pursued" raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim. *Estelle*, 429 U.S. at 107.

The Rhineharts' medical literature says nothing about when, how often, or even if an ESLD patient should see a specialist before he is diagnosed with esophageal varices. And they presented no expert medical testimony on this. The Rhineharts have thus shown only a desire for a more aggressive treatment, and they have failed to introduce the requisite evidence for a jury to find that this treatment was necessary. *See Anthony*, 701 F. App'x at 464 (requiring a plaintiff to show the need for a more aggressive treatment than the one he received).

## ii. Post-Hospitalization

When Rhinehart was in the hospital in June 2010, Dr. Schachinger performed an EGD scope, which revealed four columns of esophageal varices with no active bleeding, and he successfully placed seven esophageal bands to obliterate the varices. In his post-procedure report, he recommended that Rhinehart continue taking Propranolol (a beta-blocker medication that reduces blood pressure) and "followup [sic] as an outpatient with the prison gastroenterologist for additional EGD with esophageal banding as necessary." R.177, Endoscopy Report, Page ID# 2421.

When Rhinehart was discharged from the hospital, his "discharge instructions" included an order for blood work that morning and "[p]rimary care provider followup [sic] within one week." R.259-2, Discharge Instructions, Page ID# 4706. In accord with these instructions, Dr. Cohen examined Rhinehart at the prison the day after his discharge. Dr. Cohen reviewed Rhinehart's hospital records, ordered blood work, and started Rhinehart on Propranolol to reduce his blood pressure and prevent esophageal bleeding. Rhinehart was not referred for follow-up appointments with a gastroenterologist. Instead, Dr. Cohen monitored him, examining him on July 8 and July 19. Dr. Stevenson's employment with Corizon ended the next month, August 2010.

Given Dr. Schachinger's recommendation, the Rhineharts argue that before Dr. Stevenson's departure he provided Rhinehart with inadequate care because he failed to refer Rhinehart to a specialist for further EGD scoping and ligation banding. They contend that specialist monitoring and EGD scoping were the only appropriate treatments and assert that because Dr. Stevenson did not order these, Rhinehart endured an esophageal bleed fourteen months later.

The Rhineharts' medical literature shows that, once discovered, the "first level" treatment for esophageal varices is either use of medications such as beta blockers or EGD scoping and ligation banding performed by a specialist, or a combination of the two. In his post-procedure report, Rhinehart's hospital doctor, Dr. Schachinger, recommended both. Dr. Schachinger later testified that the risk of Rhinehart's bleeding from his varices was "higher because of the size of the varices" and that if he had a patient with Rhinehart's conditions under his exclusive control, he probably would have reevaluated Rhinehart's varices a month later and treated them if necessary. R.263-13, Schachinger Dep., Page ID# 5399–400. During his deposition, Dr. Finkel testified that he agreed with Dr. Schachinger. He explained that in the weeks and months after his hospitalization, "[i]n the private world setting, Dr. Schachinger would have recalled the patient in a timely fashion for a repeat [EGD] and banding session." R.263-14, Finkel Dep., Page ID# 5442.

A prison doctor's failure to follow an outside specialist's recommendation does not necessarily establish inadequate care. For example, in *Santiago v. Ringle*, 734 F.3d 585, 591

(6th Cir. 2013), we held that even though an inmate showed that he had a serious skin condition and that his prison doctors failed to prescribe him the treatment that a specialist had recommended, he could not proceed past summary judgment on his deliberate-indifference claim because his prison doctors prescribed an alternative treatment, and he produced no "medical proof" showing that the medications that his prison doctors prescribed were inadequate. 734 F.3d at 591.   The same was true here.   Though Dr. Cohen did not follow all of Dr. Schachinger's recommendations, she examined Rhinehart and prescribed a recognized medication for his esophageal varices, beta-blocker medication.   As in *Santiago*, the Rhineharts had the burden of introducing medical proof that this was inadequate treatment.

We need not decide whether Dr. Schachinger's and Dr. Finkel's respective testimony about what they would have done is enough to create a fact dispute about the adequacy of Rhinehart's care.   Even if it were, and assuming that the Rhineharts' evidence would allow a jury to find that he suffered a "detrimental effect" from the treatment he received, the Rhineharts' claim would still fail because they cannot establish the subjective component of their claim against Dr. Stevenson.

As noted above, the subjective component of a deliberate-indifference claim "must be addressed for each officer individually." *Garretson*, 407 F.3d at 797; *see Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991).   The record shows that Dr. Cohen was the doctor who received, interpreted, and acted on Dr. Schachinger's recommendation.   R.259-1, Medical Record, Page ID# 4663–65.   She determined and implemented Rhinehart's treatment plan after his hospitalization, examining him three times in July and prescribing medication for his esophageal varices.   The Rhineharts presented no evidence that Dr. Stevenson examined Rhinehart after his return from the hospital, or that he reviewed Dr. Schachinger's post-procedure report.   They have failed to put forward evidence suggesting that Dr. Stevenson had any knowledge of Dr. Schachinger's recommendation that Rhinehart be referred for follow-up appointments with a gastroenterologist.   In other words, the Rhineharts can point to nothing showing that Dr. Stevenson "subjectively perceived facts from which to infer substantial risk to

[Rhinehart]"—that without follow-up specialist appointments Rhinehart was at a high risk of suffering an esophageal bleed. *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837).[15]

Even if the Rhineharts could show that Dr. Stevenson knew about Dr. Schachinger's recommendation, they failed to show that the treatment Rhinehart received amounted to a conscious disregard of the risk that Rhinehart faced. *Id.* When "a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted." *Self v. Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006). Rhinehart received the plan of care directed in his discharge instructions. He was seen by Dr. Cohen the day after his discharge. She specifically referenced and implemented Dr. Schachinger's recommendation that Rhinehart be prescribed a beta-blocker medication to prevent esophageal bleeding. And the Rhineharts' medical literature confirms that prescribing this medication is a recognized treatment for reducing the recurrence of esophageal varices. R.315-3, Medical Lit., Page ID# 7802–07. The Defendant Doctors' expert, Dr. Duffy, also stated in his expert report that this treatment plan was appropriate. R.258-9, Expert Report, Page ID# 4545–47. After implementing this plan, Dr. Cohen continued to monitor Rhinehart, seeing him several times in July 2010. This treatment plan shows no disregard for Rhinehart's health risks.

Nor does Dr. Schachinger's recommendation support an inference of deliberate indifference. Dr. Schachinger's recommendation for follow-up specialist care was not a

---

[15]In her separate opinion, Judge Moore contends that we have minimalized Dr. Stevenson's involvement in Rhinehart's care after his June 2010 hospitalization. Concurring and Dissenting Op. at 45. But the record speaks for itself. Dr. Stevenson participated *only once* in Rhinehart's care after he was hospitalized. Here is the clinical note that memorialized his involvement in that one instance:

> Informed of increasing episodes of SOB,
> Assessment relayed to MD as documented.
> Continue to monitor & Detail for Combivent breath in txs TID PRN x 2 weeks.

R. 259-1, Clinical Progress Note, Page ID# 4672. Judge Moore argues that the existence of this note "makes it significantly more likely that [Dr. Stevenson] was aware of why Rhinehart was on beta blockers and what other alternatives existed." Concurring and Dissenting Op. at 45. We do not see how. The note says nothing about Rhinehart's ESLD or his beta-blocker medication. Rhinehart had smoked for forty years, experienced breathing difficulties since the late 1990s, and reported shortness of breath long before his hospitalization in June 2010. *See, e.g.*, R. 259-1, Medical Note Summary, Page ID# 4624. Given this history, no reasonable jury could infer that Dr. Stevenson knew Rhinehart faced a serious ESLD-related risk—for example, a risk of an esophageal bleed—from a nurse's having told him that Rhinehart was experiencing shortness of breath in August 2010.

prescribed treatment plan. *See Richmond*, 885 F.3d at 940 (distinguishing between an inmate's claim based on a "fail[ure] to provide the care that was ordered" and one based on "the adequacy" of an inmate's treatment); *cf. Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (reversing district court's grant of summary judgment for prison nurse who interrupted prescribed plan of treatment for inmate who had recently had surgery for gunshot wound). Though we have held that a prison doctor may not "escape liability simply because the treatment was recommended rather than prescribed," *Santiago*, 734 F.3d at 590, this is not a case in which a prison doctor ignored a specialist's recommendations. *See, e.g.*, *Verser v. Elyea*, 113 F. Supp. 2d 1211, 1215 (N.D. Ill. 2000) (allowing deliberate-indifference claim to proceed where doctor "declined to follow the recommendations of [a] specialist . . . without even examining the patient"). Instead, Dr. Cohen, who was Rhinehart's treating doctor, reviewed Rhinehart's hospital record, examined him, and implemented a recognized course of treatment. Then, she continued to monitor him. Implementing this plan instead of that recommended by Dr. Schachinger did not amount to a conscious disregard for Rhinehart's condition. *See Farmer*, 511 U.S. at 844; *cf. Blank v. Bell*, 634 F. App'x 445, 449 (5th Cir.), *cert. denied*, 136 S. Ct. 2036 (2016) (holding that prison medical provider's failure to refer inmate with Crohn's disease to a specialist did not amount to deliberate indifference despite discharge instructions recommending such a referral because the inmate was seen by his prison doctor who prescribed medications indicated on inmate's discharge instructions and the referral decision remained with prison doctor); *Heidtke v. Corr. Corp. of Am.*, 489 F. App'x 275, 281 (10th Cir. 2012) (holding that prison doctor was not deliberately indifferent to inmate's serious medical needs for failing to follow discharge instructions directing that inmate be returned to hospital if some symptoms were observed because prison doctor examined inmate on three occasions, ordered x-rays, prescribed medication, and monitored inmate's condition).

The Rhineharts' reliance on Dr. Schachinger's and Dr. Finkel's respective testimony about what would have happened were Rhinehart a private patient of Dr. Schachinger's at most raises "a simple question of whether [Rhinehart's prison doctors] made the right medical judgment in treating him." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). A disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth Amendment. *Alspaugh*, 643 F.3d at 169. Indeed, as the

Supreme Court has instructed, "forms of treatment" are generally "a classic example of a matter for medical judgment" that "does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107; *see also Richmond*, 885 F.3d at 941 (holding that "it would be improper for this court to overturn [a doctor]'s medical judgment").

The Rhineharts argue that Dr. Stevenson's failure amounts to more than a disagreement among doctors. They claim that every general physician knows that ESLD requires specialist treatment and so a jury could find that Dr. Stevenson knew that Rhinehart needed specialist care but failed to ensure that he received it. Reply Br. at 20–21. They rely on our decision in *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).

In *LeMarbe*, we allowed a deliberate-indifference claim to survive summary judgment in part because of a doctor's failure to refer an inmate to a specialist. During an exploratory surgery, the doctor encountered five liters of bile in the inmate's abdomen. *Id.* at 432–33. After failing to locate and repair the source of the leak, the doctor drained the bile from the inmate's abdomen, and though he was concerned about the fluid collecting again, he closed the incision. *Id.* at 433. After the surgery, the doctor monitored the inmate himself and did not refer him to a specialist. *Id.* The bile again pooled in the inmate's abdomen and caused serious injuries. *Id.* at 433–34. The inmate sued, alleging that the doctor was deliberately indifferent to his serious medical needs when, after surgery, he failed promptly to refer him to a specialist. *Id.* at 438. In holding that the plaintiff's claim raised more than just a question of whether the operating doctor made the right medical judgment in sealing the incision and monitoring the inmate, we emphasized that the inmate presented evidence that "*any* general surgeon" in the operating doctor's position would know that "if he could not locate the bile, then he had to refer the patient to someone with the training and experience to find and fix the bile leak." *Id.* (emphasis added).

*LeMarbe* does not control this case. There, the need for specialist treatment was obvious because the operating doctor knew that the patient's abdomen was leaking, and he knew that he could not fix it. Certainly, a jury is entitled to find reckless a doctor who fails to act in such a situation. But a doctor's observing a serious medical problem, failing to locate its cause, and refusing to take further action is quite different from the situation here, where Dr. Cohen treated her patient with a recognized medication. In short, the Rhineharts have failed to enter evidence

from which a jury could find that it would have been obvious to any treating physician that Rhinehart needed to see a gastroenterologist after surgery rather than receive beta blockers and general internist monitoring to control his esophageal varices.

Because a reasonable jury could not find that the Rhineharts established the objective and subjective components of the their deliberate-indifference claim against Dr. Stevenson, the district court properly granted summary judgment in his favor.

## B.  Dr. Edelman

Dr. Edelman was the medical director for "Utilization Management" at Corizon.  In that position, he was an administrative, non-treating doctor who approved or denied specialist medical referrals that treating doctors sought for their patients.  The Rhineharts allege that Dr. Edelman showed deliberate indifference to Rhinehart's serious medical needs at three distinct times: (1) after he approved a specialist consultation for Rhinehart but failed to ensure that Rhinehart was promptly referred for specialist care, (2) in October 2011 when he denied Rhinehart's request to see a specialist for evaluation for a liver transplant, and (3) in October 2011 when he denied a specialist's recommendation that Rhinehart be referred for an evaluation for a TIPS procedure.  The Rhineharts' first allegation, like that against Dr. Stevenson, fails because the Rhineharts have not introduced evidence that would allow a reasonable jury to find that Rhinehart's ESLD required a prompt specialist referral.  Because the Rhineharts' two remaining grievances against Dr. Edelman raise different issues, we address those in more detail below.

### i.  Denial of Rhinehart's Request for Consideration for a Liver Transplant

On October 12, 2011, Dr. Edelman saw Rhinehart through telemedicine.  R.263-9, Clinical Progress Note, Page ID# 5285.  Dr. Edelman's notes explain that during their appointment, Rhinehart asked to be referred for evaluation for a liver transplant, and Dr. Edelman responded that "his liver health is such that he would not be anywhere near qualifying" for one, but "assured him that [his prison doctors] are completely capable of providing treatment for his current issues."  *Id.*  The Rhineharts argue that denying Rhinehart's request for a liver transplant evaluation amounted to inadequate care.

To show that such a referral was medically necessary, they point to three pieces of medical proof: (1) medical literature that explains that patients with ESLD have a high risk of death and that liver transplantation is the only curative treatment, (2) Dr. Schachinger's testimony that after the June 2010 banding procedure he probably would have referred Rhinehart to a tertiary center that performs a liver transplant to determine if that might be necessary, and (3) Dr. Finkel's testimony that he agreed with Dr. Schachinger's opinion that he would have referred Rhinehart for evaluation for a liver transplant, that Rhinehart would have been a candidate for one, and that he "probably would have done very well with a liver transplant."

Despite this evidence, the district court determined that the Rhineharts "failed to introduce verified medical evidence that Rhinehart was harmed by [Dr.] Edelman's failure to have him considered for a liver transplant." *Rhinehart*, 2017 WL 3913333, at *11 (E.D. Mich. Sept. 7, 2017). In reaching that conclusion, the court relied on this court's decision in *Anthony v. Swanson*, 701 F. App'x 460 (6th Cir. 2017), where we held that a deliberate-indifference claim based on a "desire for additional or different treatment" will typically require evidence, likely expert medical testimony, "showing the medical necessity for such a treatment." *Id.* at 464.

The facts in *Anthony* are close to those here. An inmate was diagnosed with severe radiation poisoning in his rectum. *Id.* at 461. A doctor outside the prison tried to treat his condition with a steroid cream, but when the cream did not work, the doctor recommended a colostomy surgery—a surgical procedure in which portions of the bowel are removed and the remaining bowel system is diverted to a pouch allowing stool to exit outside the body. *Id.* The inmate told his prison doctor about the outside doctor's recommendation, but the prison doctor denied the surgery and instead prescribed anti-reflux medication, pain pills, and a steroid cream. *Id.* This court affirmed a grant of summary judgment for the prison doctor on the inmate's claim that she exhibited deliberate indifference to the inmate's serious medical needs by declining to schedule the recommended colostomy surgery. *Id.* at 464. The court instructed that "a plaintiff with a complex diagnosis . . . [must] provide expert testimony as to the proper treatment" so that a fact-finder can determine that the inmate's symptoms "would have been alleviated by" the desired treatment and that the inmate's condition "required" that treatment. *Id.*

In *Anthony*, the inmate failed to present medical testimony showing that the colostomy would have alleviated his symptoms or that the pills and cream that he received were an inadequate treatment for his condition. *Id.*; *see also Blosser v. Gilbert*, 422 F. App'x 453, 461 (6th Cir. 2011) (holding that arrestee, who alleged that his prison doctor failed to treat adequately his torn biceps tendon, could not prevail on his deliberate-indifference claim based on the doctor's failure promptly to send him to a specialist because he provided no medical evidence that he would have received surgery, was a candidate for surgery, or was harmed by the prison's delay in scheduling a specialist appointment). Unlike the inmate in *Anthony*, the Rhineharts presented some medical evidence and expert medical testimony in support of their claim against Dr. Edelman.

They presented some proof that a new liver would have alleviated Rhinehart's ESLD. Their medical literature explains that a liver transplant is the only cure for ESLD. Also, Dr. Finkel opined that Rhinehart "probably would have done very well with a liver transplant, because he had a low MELD score." R.263-14, Finkel Dep., Page ID# 5442. This is enough for a jury to find that if Rhinehart had received a new liver, it likely would have alleviated his symptoms.

But because of the nature of liver transplants (i.e., that a surgery can be completed only if a liver is available), to prove that a referral for consideration for a liver transplant was "medically necessary," the Rhineharts had to show more than a likelihood that a new liver would have cured Rhinehart's ESLD. They also had to present enough evidence for a jury to find that Rhinehart likely would have received a new liver. *Cf. Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (explaining that because "§ 1983 creates a species of tort liability" courts should look to the "common law of torts," which "defin[e] the elements of damages and the prerequisites for their recovery," including causation (citations omitted)). Dr. Finkel opined that Rhinehart would have been placed on the list—"[m]aybe he would have received a liver, maybe he wouldn't have received a liver, but he would have been a candidate." R.263-14, Finkel Dep., Page ID# 5442. But the district court found this to be insufficient. *Rhinehart*, 2017 WL 3913333, at *11 (E.D. Mich. Sept. 7, 2017). We agree.

Considering the severe shortage of available livers,**16** testimony that an inmate had some unidentified chance of receiving a new liver is not enough. Rhinehart's MELD score of a 7 (on a scale of 6 to 40) "counseled against his candidacy for a liver transplant." *See Lopes v. Riendeau*, 177 F. Supp. 3d 634, 659 (D. Mass. 2016) (holding that objective prong of prisoner's Eighth Amendment claim not satisfied when claim was based on prison doctor's failure to refer inmate for a liver transplant when inmate had a low MELD score of 11). Presented with only Dr. Finkel's testimony, no reasonable jury could find by a preponderance of the evidence that a referral for a liver transplant would have alleviated Rhinehart's symptoms because it could not find that a referral would have resulted in Rhinehart's receiving a new liver.

Even if the Rhineharts had shown that a liver transplant was medically necessary and that Rhinehart suffered harm from Dr. Edelman's failure to send him for the referral, their claim would still fail because they failed to show that Dr. Edelman acted with deliberate indifference to Rhinehart's medical needs. The Rhineharts needed to show that Dr. Edelman consciously disregarded a substantial risk to Rhinehart's health. But they presented no evidence that when Dr. Edelman declined to refer Rhinehart for a consultation, he knew that Rhinehart would have been a realistic candidate for a new liver. Even if Rhinehart were a realistic candidate for a liver transplant, if Dr. Edelman subjectively believed that Rhinehart were not, then he could not have been deliberately indifferent in denying a consultation referral. A refusal based on incorrect knowledge shows no more than negligence.

The evidence confirms that when Dr. Edelman rejected Rhinehart's request, he believed that Rhinehart was not realistically eligible for a liver transplant. At that time, Rhinehart's liver condition had been regularly monitored through examinations and testing. And shortly before Rhinehart asked Dr. Edelman to refer him for a liver transplant consultation, he had undergone blood tests. R.259-1, Clinical Progress Note, Page ID# 4677–78. Dr. Edelman was aware of these tests, as he had discussed the results with Rhinehart's treating doctor. *Id.* Dr. Edelman had also discussed Rhinehart's case with Dr. Kosierowski, a Corizon oncologist and consultant. They determined that there was no need to send Rhinehart for an evaluation for a liver transplant.

---

**16***See* United Network for Organ Sharing, The Organ Procurement and Transplantation Network, Transplants in the U.S. by Region, at https://optn.transplant hrsa.gov/data/ (last modified June 26, 2018).

R.258-4, Affidavits of Dr. Edelman and Dr. Kosierowski, Page ID# 4500–09. In fact, because Rhinehart filed a lawsuit at that time, Dr. Edelman signed an affidavit explaining his medical opinion that Rhinehart was not a candidate for a liver transplant. *Id.* at Page ID# 4507–08. Based on Dr. Edelman's understanding of the process for determining which patients may receive a new liver (a process which the Rhineharts do not contest), Rhinehart's MELD score placed him near the bottom of the list (7 on a scale ranging from 6 to 40, with a 40 representing the top of the list). Based on this information, Dr. Edelman swore that he believed that Rhinehart was not a candidate for a liver transplant.

Years later, Dr. Finkel disputed Dr. Edelman's opinion about Rhinehart's eligibility for a liver transplant. But this does not show that Dr. Edelman knew (when he made the decision) that Rhinehart may have been realistically eligible for a transplant. Though Dr. Finkel opined that Rhinehart had a chance at receiving a liver, he admitted that Rhinehart's MELD score of 7 "would not have placed him at the top of the list for [a] liver transplant." R.263-14, Finkel Dep., Page ID# 5442. So his opinion does not directly contradict that of Dr. Edelman. More important, however, Dr. Finkel's opinion falls short of what a jury would need to infer that Dr. Edelman knew that he was denying Rhinehart a realistic chance at receiving a liver. At most, Dr. Finkel's testimony establishes a dispute about whether Rhinehart objectively had a chance of receiving a liver. This is not enough. To infer that Dr. Edelman knew that Rhinehart had a chance at receiving a liver, the Rhineharts would need to put forth evidence showing that "any doctor would have known" that someone in Rhinehart's condition would have been realistically eligible for a liver transplant. *Cf. LeMarbe*, 266 F.3d at 434 ("Dr. Sarnelle explained that any general surgeon would have known, upon discovering five liters of bile in LeMarbe's abdomen . . . that LeMarbe had to be referred immediately to a specialist who could locate and stop the leak if the surgeon was unable to do so himself."). Without this evidence, no reasonable jury could conclude that Dr. Edelman acted with deliberate indifference to Rhinehart's serious medical need when he advised him that he was ineligible for a liver transplant.

ii. Denial of a Specialist's Recommendation that Rhinehart
be Referred for an Evaluation for a TIPS Procedure

When his esophageal varices bled in October 2011, Rhinehart was admitted to the hospital and Dr. Schachinger performed an emergency banding procedure. After the procedure, Dr. Schachinger wrote a report that recommended a treatment plan. One recommendation was that Rhinehart be transferred to a tertiary care institution to undergo a TIPS procedure to lower the tension in his portal vein and prevent any more bleeding. R.259-2, Endoscopy Report, Page ID# 4713. He advised that "the transfer should occur if [Rhinehart] has additional bleeding" because more banding would not be an option. *Id.* He warned that "there is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred." *Id.*

Dr. Al-Shihabi, the hospitalist who saw Rhinehart at that time, also wrote a report. In it, he reiterated that Dr. Schachinger "recommended strongly to transfer [Rhinehart]" to a facility where they could do a TIPS procedure to decrease the pressure on the portal vein and decrease the chance of a re-bleed. R.259-2, Progress Report, Page ID# 4715. According to Al-Shihabi, he spoke with Dr. Edelman and Dr. Stieve about transferring Rhinehart. *Id.* at Page ID# 4715–16. But both doctors denied the transfer. *Id.* at Page ID# 4715.

The Rhineharts claim that because Rhinehart was denied a referral for consideration for a TIPS procedure, he received inadequate treatment for his ESLD. As with the denial of a referral for a liver-transplant consultation, the Rhineharts' claim is that adequate care required a particular treatment. Thus, this court's analysis in *Anthony* again governs their claim. The Rhineharts must present medical proof that the inmate's symptoms "would have been alleviated by" a TIPS and that the inmate's condition "required" that treatment. *Anthony*, 701 F. App'x at 464.

The Rhineharts' claim fails on the first prong. Dr. Schachinger's and Dr. Al-Shihabi's respective hospital reports show that a TIPS was recommended to prevent Rhinehart's esophagus from re-bleeding. Dr. Schachinger confirmed this in his deposition. R.263-13, Schachinger Dep., Page ID# 5403. When the Rhineharts' own expert was asked about the TIPS procedure, he explained that it would "lower[] the pressure" in the esophageal varices and "would have substantially reduced the risk of rebleeding." R.263-14, Finkel Dep., Page ID# 5435, 5440. But

after Dr. Edelman denied the request for Rhinehart to be evaluated for a TIPS procedure Rhinehart never suffered another re-bleed.  Because Rhinehart never again experienced that symptom, the Rhineharts cannot use a TIPS's effectiveness at preventing esophageal bleeding to show that it would have alleviated his symptoms.

So the Rhineharts had to show that a TIPS procedure would have alleviated some other symptom.  Recognizing this, they contend that a TIPS would have had other beneficial effects. They mainly assert that a TIPS would have alleviated pain caused by Rhinehart's ascites, which he endured until his death.  They point to Rhinehart's medical records showing that after the denial of a TIPS he continued to experience abdominal pain and distension around his liver area up until his death.

The Rhineharts' medical literature provides that the first form of treatment for ascites is reducing the patient's salt and alcohol consumption and prescribing oral diuretics (water pills). R. 345-6, Medical Lit., Page ID# 8802, 8807, 8812.  If those treatments are insufficient, doctors use paracentesis (a needle inserted into the abdomen) to drain the fluid in the abdomen.  *Id.* at Page ID# 8802, 8808.  And if paracentesis does not control fluid accumulation, the doctor may recommend that the patient undergo a TIPS procedure.  *Id.* at Page ID# 8802, 8808, 8812.  This might occur where a patient has "difficult to treat ascites," has "loculated fluid," or is "unwilling or unable to receive frequent paracentesis."  *Id.* at Page ID# 8802, 8809.  Accordingly, paracentesis is the "most widely accepted treatment" for patients with severe ascites, and doctors only turn to a TIPS procedure in certain circumstances.  *Id.* at Page ID# 8809.  For these "appropriately selected patients," a TIPS procedure is considered a highly effective way to treat ascites and mitigate pain.  *Id.* at Page ID# 8809; R.315-3, Medical Lit., Page ID# 7813.

The problem for the Rhineharts is that they have not pointed to any medical evidence showing that Rhinehart fell within the group of ascites patients for which a TIPS procedure was medically necessary.  Instead, the record reflects that Rhinehart was prescribed diuretics and underwent paracentesis to treat his ascites.  And since the Rhineharts do not contend that Rhinehart had "difficult to treat ascites" or "loculated fluid," that Rhinehart was unwilling or unable to receive frequent paracentesis, or that the diuretics and paracentesis were not working, we cannot conclude that Rhinehart's treatment was inadequate.

Moreover, even if the Rhineharts had shown that the diuretics and paracentesis did not effectively alleviate Rhinehart's pain, the record shows that Rhinehart received an alternative treatment for his pain—regular monitoring and pain medication. The Rhineharts have presented no medical proof that this was an inadequate treatment plan. *See, e.g.*, *Johnson v. Million*, 60 F. App'x 548, 549 (6th Cir. 2003) (holding that inmate with liver disease could not establish deliberate-indifference claim against his prison healthcare providers when inmate was repeatedly examined for his complaints of stomach pain and prescribed medications, ordered blood tests, and advised about his diet). The Rhineharts' expert testified that a TIPS procedure is the "gold standard" of treatment for patients with ESLD. R.263-14, Finkel Dep., Page ID# 5435. But the Eighth Amendment does not require prison medical providers to provide inmates with "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). An inmate is entitled to adequate medical care, not the best care possible. *See Miller*, 408 F.3d at 819 (explaining that the objective prong of an Eighth Amendment claim requires care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" (citation omitted)).

But even if the Rhineharts had established that a TIPS procedure was necessary to alleviate Rhinehart's pain, and that the pain medication he received was inadequate for doing so, their claim would still fail because no reasonable jury could find that Dr. Edelman acted with deliberate indifference when he denied Dr. Schachinger's recommendation to transfer Rhinehart. As the district court explained, whether a jury could find that Dr. Edelman acted with deliberate indifference depends on whether he exercised medical judgment—whether the decision amounted to a disagreement among physicians. *See Estelle*, 429 U.S. at 107 (holding that a poor exercise of medical judgment would constitute medical malpractice, which would fail to rise to the level of a constitutional violation); *Rhinehart*, 509 F. App'x at 513 ("Neither negligence alone, nor a disagreement over the wisdom or correctness of a medical judgment is sufficient for the purpose of a deliberate indifference claim."). Because the record shows that Dr. Edelman made a medical judgment in declining to refer Rhinehart for a TIPS procedure, the Rhineharts cannot establish the subjective component of their claim against him.

The record reveals that when Dr. Edelman decided against transferring Rhinehart for consideration for a TIPS procedure, he consulted with Dr. Stieve. That Dr. Stieve played a role in Dr. Edelman's decision was important because during his deposition, Dr. Stieve described his familiarity with Rhinehart's liver condition and the TIPS procedure. Dr. Stieve testified that "[e]sophageal varices banding was a very common thing" for him to be involved with and that he "would often evaluate inmates to see whether they were a candidate for a TIPS procedure." R.340-1, Stieve Dep., Page ID# 8589. He explained that he "had been involved with approving other TIPS procedures for other inmates," and that "those inmates had different circumstances" like preparing for a liver transplant. *Id.* at Page ID# 8590.

In an administrative note, Dr. Stieve discussed the reasons for denying Rhinehart's referral for a TIPS evaluation. R.259-1, Progress Note, Page ID# 4689. In that note, he explained that he and Dr. Edelman recognized that a TIPS could reduce a hypothetical risk of re-bleed but that the procedure would not prolong Rhinehart's life and came with an increased risk of brain disease. *Id.* In other words, he explained that the doctors refused to transfer Rhinehart for a TIPS consult after weighing the potential health benefits that the procedure could provide against the potential side-effects—a process that required medical judgment.

The Rhineharts dispute that Dr. Stieve had any role in Dr. Edelman's decision. They recycle an argument that they made to the district court that Dr. Stieve only "concurred" with Dr. Edelman's decision and that Dr. Stieve could not make the decision. As the district court held, however, Dr. Stieve's testimony that he concurred with Dr. Edelman that Rhinehart should not be transferred does not mean that he had no input or influence on the decision. Dr. Stieve's administrative note shows that he and Dr. Edelman discussed the merits of transferring Rhinehart. And Dr. Stieve testified that he discussed Rhinehart's case with Dr. Al-Shihabi and explained why not transferring Rhinehart would be advisable. R.340-1, Stieve Dep., Page ID# 8589. Moreover, Dr. Edelman testified that he had "denied the transfer because [he] talked to Dr. Stieve about it." R.263-2, Edelman Dep., Page ID# 5001. Thus, the district court correctly considered Dr. Stieve's medical judgment and input in determining whether Dr. Edelman employed medical reasoning in making the decision.

Both the Rhineharts and Judge Moore in her separate opinion also argue that Dr. Edelman's decision was not a medical judgment because it was an illegitimate decision. *See* Appellants' Br. at 25; Reply Br. at 22; Concurring and Dissenting Op. at 51 ("[A] rational factfinder could conclude that [Dr.] Edelman's justification for denying Rhinehart a TIPS procedure was mere pretext to mask deliberate indifference."). They contend that given Dr. Schachinger's recommendation that Rhinehart be referred for consideration for a TIPS procedure, Dr. Edelman too heavily weighed (or unreasonably considered) the danger of Rhinehart's developing brain disease. Their strongest evidence comes from Dr. Finkel's testimony. He opined that a TIPS procedure would have increased Rhinehart's "chance of living from his end-stage liver disease" and would have come with a "less than 20 percent" risk of developing brain disease. R.263-14, Finkel Dep., Page ID# 5440. This testimony questions the correctness of Dr. Edelman's decision. But it does not provide enough evidence for a jury to conclude that Dr. Edelman's decision was not a medical one. We know this because even Dr. Schachinger, the very doctor who suggested that Rhinehart be considered for a TIPS procedure, testified that Dr. Edelman's reasoning was legitimate. During his deposition, he was asked whether, considering his recommendation, there was "any legitimate reason" for Dr. Edelman to deny Rhinehart a referral for consideration for a TIPS procedure. R.263-13, Schachinger Dep., Page ID# 5407. Dr. Schachinger responded:

> A: . . . It looks like they were concerned—rightly so—that there are certainly side effects and other co-morbidities that can occur because of the TIPS like [brain disease].

*Id.* In other words, the very doctor who recommended that Rhinehart be considered for a TIPS acknowledged that Dr. Edelman was "rightly" concerned about the risks of side effects from that procedure. Dr. Schachinger's testimony is significant not because it shows that Dr. Edelman and Dr. Stieve made the right decision, but because it shows that the medical reasons relied on by Dr. Edelman and Dr. Stieve were legitimate, not pretextual. Thus, Dr. Finkel's disagreement with Dr. Edelman and Dr. Stieve at most raises an issue of medical malpractice not deliberate indifference.

Finally, the Rhineharts attack Dr. Edelman's weighing of the risk of brain disease because, as they assert, Rhinehart had already been "experiencing symptoms" of brain disease before Dr. Edelman denied the referral. They also argue that even if this condition worsened

after a TIPS, it could be managed with medication and treatment. R.296-3, Medical Lit., Page ID# 7083–88, 7123–26. But this cannot show that Dr. Edelman's decision involved no medical judgment. First, that Rhinehart had brain disease before Dr. Edelman's decision finds no support in his medical record. The Rhineharts point to no diagnosis of hepatic encephalopathy and instead cite only his having complained about experiencing sporadic "mental clouding" and "confusion." R.259-1, Medical Record, Page ID# 4629, 4640.

And even taking as true that Rhinehart experienced symptoms much like brain disease at some point before Dr. Edelman's decision, this does not render illegitimate Dr. Edelman's having considered the risk of brain disease in making his call on the TIPS referral. The last time Rhinehart had complained of confusion, according to the medical records that the Rhineharts proffer, was March 2010—more than eighteen months before Dr. Edelman made his decision. So Dr. Edelman would have been justified in considering that Rhinehart had not experienced these symptoms in over a year and a half. In any event, Rhinehart's having experienced symptoms of brain disease and his risk of developing brain disease from a new procedure are two different ills. A doctor contemplating a patient's treatment would likely commit malpractice if he failed to consider the latter even if he knew about the former. Thus, Dr. Edelman had good reason to consider this additional side-effect, and the fact that he did so does not render his decision a nonmedical one.

Because a reasonable jury could not find that the Rhineharts established the objective and subjective components of the their deliberate-indifference claim against Dr. Edelman, the district court properly granted summary judgment in his favor.[17]

---

[17]Though the Rhineharts also appeal the district court's decision finding inadmissible Dr. Finkel's testimony about pain Rhinehart allegedly endured "due merely to hypertension," we need not address the district court's ruling on this issue. Dr. Finkel's testimony would support only the objective component of the Rhineharts' deliberate-indifference claim against Dr. Edelman, and we hold that the Rhineharts also failed to establish the subjective component of their claim.

V.

Rhinehart sued his prison doctors under the Eighth Amendment, alleging that they inflicted "cruel and unusual punishments" on him.  We cannot allow his claim to proceed to trial, however, because "[m]edical malpractice," even assuming it occurred, "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  Inapt constitutional comparisons, healthcare costs, and prior sins do not decide this case.  The Constitution does.  The Eighth Amendment forbids "*obduracy and wantonness, not inadvertence or error in good faith*." *Wilson*, 501 U.S. at 299 (quoting *Whitley*, 476 U.S. at 319).  To hold a doctor liable under the Constitution for a prisoner's medical treatment, the doctor must have acted with "deliberate indifference" to the prisoner's health.  *Estelle*, 429 U.S. at 104.  Because the Rhineharts have not presented proof that the Defendant Doctors acted with "deliberate indifference" in the provision of medical treatment so as to constitute "cruel and unusual punishment[]" under the Eighth Amendment, we AFFIRM the district court's grant of summary judgment for the Defendant Doctors.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part in the judgment and dissenting in part. I agree with the majority's conclusions regarding three of the claims that Plaintiffs-Appellants Lewis and David Rhinehart (the Rhineharts) bring on behalf of their deceased brother, Kenneth Rhinehart (Rhinehart), regarding the medical care that he did—and did not—receive while incarcerated in the Michigan state prisons. Given the legal precedent governing such claims, I believe that summary judgment was proper with regard to Defendants-Appellees Dr. Vernon Stevenson's and Dr. Adam Edelman's conduct prior to Rhinehart's June 2010 hospitalization, as well as with regard to Edelman's having declined to refer Rhinehart for a liver transplant. I respectfully disagree, however, with regard to (1) Stevenson's having failed to ensure that Rhinehart saw a specialist after the June 2010 hospitalization and (2) Edelman's having declined to refer Rhinehart for a transjugular intrahepatic portosystemic shunt (TIPS) procedure after Rhinehart's October 2011 hospitalization. I write to explain those two points of broader disagreement.

## I. STEVENSON'S FAILURE TO REFER RHINEHART POST JUNE 2010 HOSPITALIZATION

While the majority is of course correct that the Eighth Amendment has not always been understood to cover medical care for prisoners, the Supreme Court has been clear that Eighth Amendment challenges are to be judged in accordance with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Included among our modern standards of decency is the rule that when a government keeps a person in prison—and thus prevents him from accessing any health care beyond what the government affords him—it may not be deliberately indifferent to that person's serious medical needs. *Id.* at 103–04. The test for allegations of deliberate indifference to a prisoner's serious medical needs, as the majority notes, includes both an objective and a subjective prong. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). I discuss these two prongs in turn.

**A. Objective**

First, the Rhineharts must establish that "the deprivation" that Rhinehart suffered was "sufficiently serious," such that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* I believe that a rational factfinder could conclude that Stevenson's failure to refer Rhinehart for follow-up with a specialist meets this test. As the Rhineharts' submissions make clear, cirrhosis causes portal hypertension, and portal hypertension in turn can cause both ascites and varices, the former of which is painful and the latter of which can kill. *See, e.g.*, R. 315-3 (Medical Lit.) (Page ID #7802–03); R. 327-2 (Medical Lit.) (Page ID #8268); R. 345-6 (Medical Lit.) (Page ID #8804). During his June 2010 hospitalization, Rhinehart was treated for both: approximately half a liter of ascitic fluid was removed from his abdomen via paracentesis, and an emergency scoping (or "EGD") and banding procedure was performed on his varices. R. 259-2 (June 2010 Discharge Summary at 2–3) (Page ID #4706–07) (*sealed*). Dr. Lynn Schachinger, who did the scoping and banding, accordingly recommended that Rhinehart see a "gastroenterologist for additional EGD with esophageal banding as necessary," R. 177 (Medical Records) (Page ID #2421), noting Rhinehart's "high risk for both esophageal varices and bleeding from them," R. 259-2 (June 2010 Discharge Summary at 2–3) (Page ID #4706) (*sealed*). As the majority notes, both Dr. Stuart Finkel (the Rhineharts' expert) and Schachinger testified that they would have very likely ensured that such follow-up occurred for any comparable patient under their personal care, R. 263-13 (Schachinger Dep. at 17) (Page ID #5400); R. 263-14 (Finkel Dep. at 109) (Page ID #5442), and it is not hard to understand why, *see* R. 296-3 (Medical Lit.) (Page ID #7114) (discussing dangers of variceal bleeding); R. 345-6 (Medical Lit.) (Page ID #8803) (noting that "development of ascites in a cirrhotic patient . . . portends a poor prognosis"). Stevenson's failure deprived Rhinehart, a patient whose end-stage liver disease had yielded both varices and ascites, of a chance even to consult with the kind of doctor specially equipped to monitor the grave risks that those symptoms signaled. A factfinder could rationally conclude that such a deprivation posed a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834.

Rhinehart did, of course, receive *some* treatment following the June 2010 hospitalization: he was prescribed beta blockers. Thus, as the majority notes, this claim against Stevenson

alleges *inadequate* treatment, and the Rhineharts accordingly "must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (quoting *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001)); *see also Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004). But what the majority fails to recognize outright, *see* Maj. Op. at 25 (declining to decide), is that there is a clear basis on which a rational factfinder could find for the Rhineharts: both Finkel's and Schachinger's testimony support the conclusion that Rhinehart's October 2011 crisis could have been avoided if he had merely been monitored occasionally by a gastroenterologist. R. 263-13 (Schachinger Dep. at 17, 19–20) (Page ID #5400); R. 263-14 (Finkel Dep. at 108) (Page ID #5441) ("Had [Rhinehart received follow-up care], the likelihood of that second bleed a year later would have been reduced or eliminated entirely."). Common sense confirms this premise, because it is not at all clear—nor does the defense or the majority explain—how Rhinehart's primary-care providers could have been expected to identify, much less forestall, the crisis that Rhinehart in fact suffered in October 2011 in the absence of a specialist's knowledge and tools.[1] Instead, as I read the record, a rational factfinder could easily conclude that the objective result of the "care" that Rhinehart received was to let the prisoner's esophageal veins, rather than a specialist's monitoring, serve as the warning system. That takes this case outside the analogic sweep of a case like *Santiago*, to which the majority likens it, Maj. Op. at 24–25, in which an outside dermatologist recommended one medication for a condition but prison doctors continued to prescribe another. *See Santiago*, 734 F.3d at 591; *see also id.* at 588 (noting that the medication that the outside dermatologist recommended was "not part of the

---

[1]To be clear, as the majority observes, Maj. Op. at 23, endoscopy is not the only way for a medical professional to monitor a patient's varices—x-rays and lab tests can be used as well. R. 315-3 (Medical Lit.) (Page ID #7803). But it is not clear that Rhinehart's generalist prison doctors were equipped to perform this monitoring, and some medical evidence suggests that the best approach for managing variceal bleeding is to enlist "a team of gastroenterologists, hepatologists, hematologists, critical care physicians, surgeons, and interventional radiologists," which suggests that follow-up with a single specialist was closer to a bedrock necessity than a gold-standard luxury. *See* R. 296-3 (Medical Lit.) (Page ID #7130). Schachinger, moreover, clearly recommended that Rhinehart see a "gastroenterologist for additional EGD with esophageal banding as necessary," providing medical evidence that in *this* case, a qualified medical expert thought that generalist monitoring was not enough. R. 177 (Medical Records) (Page ID #2421); *see also* R. 263-13 (Schachinger Dep. at 15–17) (Page ID #5399–5400). And while Schachinger was not empowered to make binding prescriptions for what kind of care Rhinehart should receive, *see* R. 263-13 (Schachinger Dep. at 15–16) (Page ID #5399), "our cases do not support the notion that a prison doctor who delays treatment may escape liability simply because the treatment was recommended rather than prescribed," *Santiago*, 734 F.3d at 590.

standard treatment" for the prisoner's condition and that the prisoner *did* receive the recommended medication within less than a month). Here, while the beta blockers that Rhinehart was prescribed may have decreased the risk of a further crisis, that risk was already heightened, as the majority notes, Maj. Op. at 24, based on the size of Rhinehart's varices. *See* R. 263-13 (Schachinger Dep. at 17) (Page ID #5400). If anything, going forward without the opportunity for any specialist monitoring under such circumstances sounds more like waiting until someone is suffering an acute appendicitis rather than seeking proactive diagnostic care at an earlier date. *See Blackmore*, 390 F.3d at 894, 899. Under these circumstances, in short, a rational factfinder could find the objective prong satisfied with regard to Stevenson's failure to refer Rhinehart to a specialist after his June 2010 hospitalization.

**B. Subjective**

The subjective prong may be a tougher climb for the Rhineharts, but I believe that they can satisfy it for purposes of summary judgment as well. "An official is deliberately indifferent where she (1) 'subjectively perceived facts from which to infer substantial risk to the prisoner,' (2) 'did in fact draw the inference,' and (3) 'then disregarded that risk.'" *Santiago*, 734 F.3d at 591 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). The Supreme Court's guidance on this question suggests that while ultimate proof at trial may be more difficult, summary judgment should be granted more sparingly. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)); *see also, e.g.*, *Santiago*, 734 F.3d at 591. In my view, the factual questions here are at least debatable enough to preclude summary judgment.

First, there is the question of what Stevenson knew. This is the toughest part of the test for the Rhineharts to satisfy, but I believe that there is enough circumstantial evidence to make summary judgment inappropriate. For one, while the majority is correct that Dr. Zivit Cohen seems to have played a larger role in Rhinehart's care than Stevenson did after the June 2010 hospitalization, there is nevertheless evidence that would enable a trier of fact to conclude that Stevenson not only supervised Cohen but also had direct responsibility for Rhinehart's care. *See*

R. 259-1 (Medical Records) (Page ID #4612) (*sealed*) ("This is the Patient of DR,Stevenson [sic] . . . ."); R, 263-4 (Howell Dep. at 40) (Page ID #5088) ("[F]or this particular prisoner, it would have been Dr. Stevenson . . . ."); R. 263-5 (Vermuri Dep. at 38–40, 130–31) (Page ID #5115, 5138) (agreeing that Stevenson was in charge of other doctors, including Cohen, and assigned patients to them); *id.* at 92, 109–111 (Page ID #5128, 5133) (agreeing that Rhinehart was specifically assigned to Stevenson). So Stevenson's role provides some circumstantial evidence to conclude that Stevenson knew what was going on with Rhinehart.

Then there is the evidence that Stevenson (prior to his August 2010 departure) not only remained involved in Rhinehart's care after the hospitalization but also—much more probatively—was consulted by a nurse as it was becoming clear that Rhinehart was not tolerating the beta blockers, which were causing him shortness of breath. *See* R. 315-2 (Medical Records) (Page ID #7736) ("Spoke with Dr. Stevenson: Informed of increasing episodes of SOB . . . ."). This is why the majority's minimization of Stevenson's involvement after the June 2010 hospitalization, *see* Maj. Op. at 25–26 & n.15, is so unsatisfying. The beta blockers were, as the majority readily acknowledges, the only meaningful treatment that Rhinehart was given to manage the life-threatening varices that had already been discovered. *See id.* at 24. And the fact that Stevenson knew about Rhinehart's difficulties with the beta blockers makes it significantly more likely that he was aware of why Rhinehart was on beta blockers and what other alternatives existed. A rational factfinder could certainly conclude as much.[2]

That brings us to the second question of the subjective prong: what Stevenson actually inferred. To be clear, the Rhineharts need not locate a mind reader who can testify to exactly what synapses fired in Stevenson's brain; it is enough to show, for example, that Stevenson "declined to confirm inferences of risk that he strongly suspected to exist." *See Farmer*, 511 U.S. at 843 n.8. Here there is again enough circumstantial evidence for summary-judgment purposes. Stevenson has been a doctor since 1997. R. 263-3 (Stevenson Dep. at 5 (Page ID #5014). He knew that Rhinehart had likely been suffering from cirrhosis from the time of his

---

[2]The majority's arguments to the contrary, *see* Maj. Op. at 25–26 n.15, are legitimate reasons that a rational factfinder could conclude otherwise *at trial*, but I do not see why they entail that we, at summary judgment, "cannot allow [Rhinehart's] claim to proceed *to* trial," *see* Maj. Op. at 40 (emphasis added).

transfer, *id.* at 48–49 (Page ID #5024–25), and he had known since well before the June 2010 hospitalization that Rhinehart's referring doctor had felt that Rhinehart needed to see specialists, including a gastroenterologist, *id.* at 56 (Page ID #5026). Stevenson also appears to have been familiar with esophageal varices, *see id.* at 113 (Page ID #5041)—at least enough to know that they require getting an expert involved. For while Stevenson asserted that he had "very limited, if any, contact with" Rhinehart after June 2010, Stevenson also testified that if he had treated someone with Rhinehart's conditions "in private practice," "[the patient] definitely would see an [sic] gastroenterologist," *id.* at 118–19 (Page ID #5042). In other words: knowing what a rational factfinder could find Stevenson to have known, Stevenson very likely would have concluded that it was highly risky for Rhinehart not to see a specialist.

Third, there is the question of whether Stevenson disregarded the risk. Here, the record is plain: aside from overseeing the provision of beta blockers and Cohen's generalist monitoring, Stevenson did nothing. *See, e.g.*, *id.* at 118 (Page ID #5042); Appellees' Br. at 31–32. The majority concludes that Stevenson cannot be held liable in light of the treatment that Stevenson's associates provided, *see* Maj. Op. at 26 (asserting that the Rhineharts have "failed to show that the treatment Rhinehart received amounted to a conscious disregard of the risk that Rhinehart faced"), but this argument gives that treatment too much credit. Just as it does not clinch this case on the objective prong, the simple fact that Rhinehart received beta blockers and generalist monitoring does not mean victory for the defendants on the subjective prong if it was clear that Rhinehart needed more. Rather, this subjective defense is available only to prison doctors who "respond[] reasonably to [a] risk." *See Farmer*, 511 U.S. at 844; *see also Comstock*, 273 F.3d at 706 (noting that a physician cannot "do[] less than [his] training indicate[s] [is] necessary" (second alteration in original) (citation omitted)); *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("If a prison doctor, for example, responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard."). And as the above discussion shows, there is medical evidence that Rhinehart needed a specialist's monitoring—just as Schachinger said that he did—even if beta blockers and a generalist might have been sufficient

for other patients.[3]  *See* R. 177 (Medical Records) (Page ID #2421); R. 263-13 (Schachinger Dep. at 15–17) (Page ID #5399–5400).  It is therefore no answer to invoke cases discussing *reasonable* responses to medical risks, *see* Maj. Op. at 26 (citing *Self*, 439 F.3d at 1232–33)), when there is evidence for a rational factfinder to conclude that Stevenson's response was unreasonable.[4]  In short, a rational factfinder could conclude that Stevenson (1) knew about Rhinehart's situation, (2) inferred the risks stemming from it, and (3) did nothing in the face of those risks.  I would accordingly reverse the district court's grant of summary judgment to Stevenson on this claim.

## II.  EDELMAN'S FAILURE TO REFER RHINEHART FOR A TIPS PROCEDURE

I also part ways with the majority on Edelman's failure to refer Rhinehart for a TIPS. Because a TIPS could have meaningfully improved Rhinehart's quality of life by diminishing his ascites, I would reverse and allow this claim to go forward too.

### A.  Objective

I agree with the majority that the Rhineharts cannot premise this claim on the possibility of further variceal bleeding given that Rhinehart died a little over a year after his October 2011 episode of variceal bleeding without suffering any further variceal bleeding.  Maj. Op. at 35. The Rhineharts therefore must, as the majority observes, "show that a TIPS procedure would have alleviated some other symptom."  *Id.*; *see also, e.g.*, *Santiago*, 734 F.3d at 590 (noting that

---

[3]In keeping with these facts, I cannot agree with the majority that "this is not a case in which a prison doctor ignored a specialist's recommendation."  Maj. Op. at 27.  Schachinger was a specialist, R. 263-13 (Schachinger Dep. at 8) (Page ID #5397); Schachinger recommended that Rhinehart follow up with a specialist for further scoping after his June 2010 hospitalization, R. 177 (Medical Records) (Page ID #2421); R. 263-13 (Schachinger Dep. at 15–17) (Page ID #5399–5400); and Stevenson, who seems to have been well-positioned to act, did nothing to make that follow-up happen.  To the extent that a rational factfinder could conclude that Stevenson knew the relevant facts and drew the relevant inferences—questions that I believe are satisfied here—this is, on my read, very much a case in which a prison doctor (Stevenson) ignored a specialist's recommendation (Schachinger's).

[4]Nor is it any answer to distinguish this case from one like *LeMarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001), in which we found sufficient evidence of conscious disregard where a doctor ignored a risk that would have been obvious to just about anyone, *see id.* at 438.  While some risks may indeed be particularly obvious, the issue here is that the facts of this particular situation, as seemingly known to Stevenson, at least arguably would have made clear to Stevenson that Rhinehart faced a serious medical risk.  Thus, given that there was evidence to conclude that *Stevenson* did "less than [his] training indicated was necessary," *Comstock*, 273 F.3d at 706 (alteration in original) (citation omitted), it is no more dispositive that Stevenson did not overlook something absurdly obvious than it would be, in a manslaughter trial, to note that the defendant did not commit first-degree murder.

plaintiffs challenging adequacy of treatment "must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" (quoting *Napier*, 238 F.3d at 742)). In contrast to the majority, I believe that the pain that Rhinehart suffered from his recurrent ascites qualifies for purposes of surviving summary judgment.

First, consider the causal chain as laid out by the medical literature in the record: Hepatitis C can cause end-stage liver disease and cirrhosis, R. 327-2 (Medical Lit.) (Page ID #8303), which in turn can cause high blood pressure in the vein connecting one's digestive organs to one's liver (portal hypertension), R. 315-3 (Medical Lit.) (Page ID #7802). Portal hypertension, in turn, can cause both varices and ascites. *See, e.g.*, *id.* (Page ID #7802–03); R. 327-2 (Medical Lit.) (Page ID #8268). More than trace amounts of ascites can in turn cause abdominal distension and pain, as well as difficulty breathing. *See* R. 315-3 (Medical Lit.) (Page ID #7803); R. 327-2 (Medical Lit.) (Page ID #8268). Aside from paracentesis, the way to treat ascites that is resistant to simpler treatments (that is, "difficult to treat ascites") is the same as the treatment for the risk of variceal bleeding: a TIPS procedure. R. 327-2 (Medical Lit.) (Page ID #8269). And that is one reason why a TIPS procedure has been found to yield a "significantly improved quality of life" on qualifying patients. *See* R. 296-3 (Medical Lit.) (Page ID #7064) (listing "decreased ascites" as one of three reasons for the effect); *see also, e.g.*, R. 315-3 (Medical Lit.) (Page ID #7813) (noting that a TIPS "ameliorates ascites"). While not expressly distilled by an expert, this literature makes clear the requisite "causal link," *see King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014), between the denial of a TIPS and pain from ascites.

Second, consider Rhinehart's actual medical history. Rhinehart, we know, had cirrhosis. *See, e.g.*, R. 263-3 (Stevenson Dep. at 48–49) (Page ID #5024–25). His cirrhosis evidently caused portal hypertension. *See, e.g.*, R. 259-2 (June 2010 Discharge Summary at 2–3) (Page ID #4706–07) (*sealed*). His portal hypertension evidently caused serious ascites at the time of both of his hospitalizations: roughly half a liter of "straw-colored fluid" was removed via paracentesis on June 29, 2010, R. 259-2 (June 2010 Discharge Summary at 2) (Page ID #4706)

(\*sealed\*), and nearly a liter and a half was removed at the end of October 2011,[5] R. 345-3 (Oct. 2011 Discharge Summary at 1) (Page ID #8755). And his ascites evidently caused ongoing pain. *See, e.g.*, R. 349-2 (Page ID #8927–28, 8930–31, 8938–40, 8950–52). That all is enough for a rational factfinder to conclude that Edelman's denial of a TIPS caused Rhinehart pain that he would not have otherwise endured.[6]

## B. Subjective

I believe that the Rhineharts can also satisfy the subjective prong of the deliberate-indifference standard on summary judgment. As noted above, the Rhineharts must introduce sufficient facts from which a rational factfinder could conclude that Edelman "(1) subjectively perceived facts from which to infer substantial risk to [Rhinehart], (2) did in fact draw the inference, and (3) then disregarded that risk." *Santiago*, 734 F.3d at 591 (citation and internal quotation marks omitted).

The first two steps are easily satisfied: there is no real debate that Edelman knew sufficient facts about Rhinehart's medical situation and had heard Schachinger's and Dr. Mohmmed Al-Shihabi's dire warnings. *See, e.g.*, R. 263-2 (Edelman Dep. at 184–85) (Page ID #4999–5000); Maj. Op. at 34. As Al-Shihabi summarized things:

> Dr. Schachinger expressed that if the patient bled again, he cannot do anything about that and the patient might bleed until he died. . . . I have discussed this case with the nurse supervisor on the secure unit and the case management who also contacted Dr. Edelman [about a transfer for a TIPS procedure]. [Dr. Edelman] denied this transfer and he said that we just need to continue monitoring the

---

[5]This was, it bears noting, a "significant amount of ascites," R. 345-3 (Oct. 2011 Discharge Summary at 2) (Page ID #8756), and the doctor who wrote Rhinehart's discharge summary made clear not only that Rhinehart had the "potential to re-bleed from his esophageal varices," but also that he would require "recurrent paracentesis if [a] TIPS procedure [were] not performed," *id.* at 1 (Page ID #8755).

[6]The majority suggests that this logic still must fail because the Rhineharts have not proven that the monitoring, diuretics, and pain medication that Rhinehart did receive was not an adequate alternative treatment plan. Maj. Op. at 35–36. But this conclusion is belied by the majority's own observation that, as the Rhineharts point out, Rhinehart "continued to experience abdominal pain and distension around his liver area up until his death," *id.*, some of which was plainly identified as ascites. *See* R. 349-2 (Page ID #8927–28, 8930–31, 8938–40, 8950–52); *see also* Reply Br. at 25–26. In other words, a rational trier of fact could conclude from those ongoing symptoms that Rhinehart *did* have "difficult to treat ascites," *see* Maj. Op. at 35 (quoting R. 345-6 (Medical Lit.) (Page ID #8802)), that his ascites was *not* being effectively managed by pain medication and/or diuretics, and thus that the treatment that Rhinehart actually received was inadequate.

patient here, even though Dr. Schachinger said that if the patient bleeds he cannot do to anything [sic] and the patient will be unstable to be transferred or do anything and the patient will definitely die.**[7]**

R. 259-2 (Oct. 2011 Progress Note at 1) (Page ID #4715) (*sealed*). Rhinehart's discharge summary from the same hospitalization, moreover, noted not only the risk of recurrent variceal bleeding, but also the risk of recurrent ascites and the likely need for further paracentesis in the absence of a TIPS procedure. *See* R. 345-3 (Oct. 2011 Discharge Summary at 1) (Page ID #8755) ("[T]he patient has potential to re-bleed from his esophageal varices and recurrent paracentesis if TIPS procedure is not performed."). Based on these facts, a rational factfinder could easily conclude that Edelman understood the facts surrounding Rhinehart's situation and inferred that there was a substantial risk.

The third step presents a harder question. As the majority indicates, Maj. Op. at 36–39, the question conceivably comes down to a mere difference of doctors' opinions: Schachinger and Al-Shihabi said that a TIPS was necessary, and Edelman and another prison administrator, Dr. Jeffrey Stieve, suggested that a TIPS was unnecessary and that its risks outweighed its rewards. *See, e.g.*, R. 263 (Edelman Dep. at 201) (Page ID #5004). If this were in fact a dilemma susceptible to no clear answer, then I agree that the Rhineharts would not be able to prove that Edelman consciously disregarded a known risk; instead, he would have permissibly adopted one of several reasonable medical approaches. *See Farmer*, 511 U.S. at 845 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."). On the other hand, however, a defendant cannot automatically win on summary judgment simply by proposing some hypothetical downside: if the defendants in *Blackmore*, for example, had claimed that they had declined to initiate an appendectomy because occasionally appendicitis patients die during

---

**[7]**Although Schachinger's endoscopy report is more ambiguously phrased, *see* R. 259-2 (Oct. 2011 Endoscopy Report at 3) (Page ID #4713) (*sealed*) ("I feel that the transfer should occur if he has additional bleeding as there is nothing further, I believe, that I can do given all the bands that are already placed on the esophageal varices and those bands would get knocked off trying to treat any additional bleeding and would be ineffective."), the surrounding text suggests that what Schachinger meant that there was nothing further that Schachinger could do *if* Rhinehart sustained further variceal bleeding, *see id.* ("[T]here is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred."). This reading is bolstered by Al-Shihabi's summary of Schachinger's position. R. 259-2 (Oct. 2011 Progress Note at 1) (Page ID #4715) (*sealed*). In any event, this ambiguity at worst creates an issue of fact suitable for further probing at trial.

appendectomies, a jury surely could have concluded that this rationale was mere pretext, given that a much greater percentage of patients die if *denied* appendectomies. *Cf. Battista v. Clarke*, 645 F.3d 449, 452, 455 (1st Cir. 2011) (upholding preliminary injunction based on district court's finding of "a collection of pretexts, delays, and misrepresentations" in prison officials' justifications, *id.* at 452). If a rational factfinder could conclude that Edelman's justification for denying Rhinehart a TIPS procedure was mere pretext to mask deliberate indifference, then summary judgment is improper.

On my read of the record, Edelman's justification is shaky enough to preclude summary judgment. True, he and Stieve had *some* facts on their side: there is no evidence that a TIPS would have prevented Rhinehart from *eventually* dying of liver disease, and use of a TIPS carries with it an increased risk of hepatic encephalopathy (HE). *See, e.g.*, R. 263-13 (Schachinger Dep. at 48) (Page ID #5407); R. 263-14 (Finkel Dep. at 102–04) (Page ID #5440); Maj. Op. at 37 (noting Stieve's explanation that a TIPS "would not prolong Rhinehart's life and came with an increased risk of brain disease"). But on closer inspection, neither of these justifications is as compelling as they at first appear.

For one, the fact that a TIPS would not have affected Rhinehart's *overall* mortality is not dispositive. Doctors are, of course, not absolved of Eighth Amendment liability simply because a particular treatment will not cure a disease. *See, e.g.*, *Scott v. Ambani*, 577 F.3d 642, 648 (6th Cir. 2009) (reversing dismissal of claim based on "refusal to provide pain medication"). Moreover, there is medical evidence from which a rational factfinder could conclude that a TIPS would have prolonged and improved Rhinehart's life. *See, e.g.*, R. 263-14 (Finkel Dep. at 102–04) (Page ID #5440); R. 296-3 (Medical Lit.) (Page ID #7064) (documenting increased quality of life from TIPS intervention, including through diminished ascites); *id.* (Page ID #7113) (documenting "significant reductions in treatment failure and in mortality" from "early use of TIPS"); *see also* R. 315-3 (Medical Lit.) (Page ID #7813) (concluding that "TIPS is effective in lowering elevated portal pressures," "has acceptable postprocedure complication and mortality rates," and "ameliorates ascites"). So the fact that a TIPS would not have changed Rhinehart's underlying prognosis does not preclude a finding that Edelman was deliberately indifferent in denying Rhinehart care that would have extended or improved his remaining years.

Then there is the danger of HE, described in one record source as "confusion and forgetfulness caused by poor liver function and the diversion of blood flow away from your liver." R. 315-3 (Medical Lit.) (Page ID #7803). But Edelman's HE justification is also questionable. First, as the Rhineharts note, Appellants' Br. at 25 & n.26, HE, while not trivial, is "a complication in a minority of patients treated with TIPS,"[8] and where it occurs it appears more likely to be episodic and temporary rather than "recurrent or refractory." R. 296-3 (Medical Lit.) (Page ID #7123); *see also* R. 315-3 (Medical Lit.) (Page ID #7813) (finding that twenty percent of TIPS recipients sustain "new or worsening" HE). In other words, the likelihood of a TIPS causing HE in Rhinehart's case—as well as the likely seriousness even if HE were to manifest—is highly speculative. Second, in contrast to the majority's ominous use of the phrase "brain disease," *see* Maj. Op. at 10–11, 37–39, the medical literature in the record describes HE as a manageable side effect—a condition that "can be treated with medications, diet, or by replacing the shunt." R. 315-3 (Medical Lit.) (Page ID #7806); *see also* R. 296-3 (Medical Lit.) (Page ID #7083) (finding certain types of shunts, which "can be modified on the basis of the patient's clinical condition," to be "effective in reducing shunt flow and rapidly improving" patients with otherwise refractory HE). In short, HE was a possible complication, but far from a certain or inexorable one.

HE is also not a condition brought on *only* by a TIPS. Rather, HE can alternately stem from portal hypertension itself—the very condition that a TIPS can help alleviate. R. 315-3 (Medical Lit.) (Page ID #7803–04). Indeed, "HE is clinically classified into three major categories: Type A occurs in patients with acute liver failure. Type B occurs in patients with [a TIPS]. Type C is related to underlying cirrhosis." R. 296-3 (Medical Lit.) (Page ID #7123). Rhinehart already fell into the first and third of those categories, meaning that he was at risk of HE regardless. Further, as the Rhineharts argue, Appellants' Br. at 26, there is evidence that Rhinehart may have been suffering from cirrhosis/portal-hypertension-induced HE at times already. R. 259-1 (Medical Records) (Page ID #4629, 4640) (*sealed*). It is therefore possible

---

[8]The physiology of TIPS-induced HE appears to arise from the fact that a TIPS works by "mak[ing] a tunnel through the liver" that "reroutes blood flow in the liver," thereby "reduc[ing] pressure in all abnormal veins." R. 315-3 (Medical Lit.) (Page ID #7805). Because it can also thereby reduce "blood flow to the liver," it "may result in toxic substances reaching the brain without being metabolized first by the liver." *Id.* (Page ID #7806).

that a TIPS actually could have *ameliorated* that preexisting condition. *See* R. 315-3 (Page ID #7813) ("Three months after TIPS, the incidence of new or worsening hepatic encephalopathy was 20%, but encephalopathy *improved* in an equal proportion of patients." (emphasis added)). In other words, it is not as if HE was simply a threat that Edelman could protect Rhinehart from by denying Rhinehart a TIPS procedure. Instead, Edelman potentially consigned Rhinehart to *continuing* to suffer with HE that a TIPS could have helped abate.[9] And in any event, Edelman was choosing between two options that *each* carried with them the risk of HE for Rhinehart.

Edelman's generalized HE justification consequently begins to look a good deal thinner, particularly when juxtaposed against Schachinger's dire warnings about Rhinehart's specific condition. *See* R. 259-2 (Oct. 2011 Endoscopy Report at 3) (Page ID #4713) (*sealed*) ("[T]here is nothing further, I believe, that I can do given all the bands that are already placed on the esophageal varices and those bands would get knocked off trying to treat any additional bleeding and would be ineffective."); *id.* ("[T]here is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred."); *see also* R. 259-2 (Oct. 2011 Progress Note at 1) (Page ID #4715) (*sealed*) ("Dr. Schachinger said that if the patient bleeds he cannot do to anything [sic] and the patient will be unstable to be transferred or do anything and the patient will definitely die."). It is, in other words, very far from clear that the risks of HE matched up with the rewards of a TIPS procedure in any meaningful way.

This imbalance looks even starker once one compares Schachinger's and Edelman's expertise. Schachinger was a specialist in gastroenterology who had twice performed endoscopies on Rhinehart. R. 263-13 (Schachinger Dep. at 8, 29–30) (Page ID #5397, 5403). Edelman, on the other hand, was an administrator who had never treated Rhinehart and "rarely saw patients" at all during the years at issue here. *See* R. 263-2 (Edelman Dep. at 24–25) (Page ID #4959–60); *see also id.* at 187 (Page ID #5000) ("[Schachinger] has more experience than me, and expertise, yes."). And in fact, as both Finkel and the Rhineharts have pointed out, R. 263-10 (Finkel Report at 9) (Page ID #5381); Appellants' Br. at 24–25, Edelman was not

---

[9]The majority does not suggest that *Schachinger*, by contrast, knew this aspect of Rhinehart's medical history. The majority's argument that Schachinger's general statement about the potential side effects of a TIPS "shows that the medical reasons relied on by Dr. Edelman and Dr. Stieve were . . . not pretextual," Maj. Op. at 38, is therefore overstated.

even clear on the nature of a TIPS procedure, opining that it was "very invasive," with an "incision . . . probably made in the femoral area."**10** R. 263-2 (Edelman Dep. at 211) (Page ID #5006). *Compare id.*, *with* R. 315-3 (Medical Lit.) (Page ID #7805) ("The TIPS procedure is not a surgical procedure. The radiologist performs the procedure within the vessels under X-ray guidance. The procedure lasts 1 to 3 hours."). While Edelman's comparative disadvantage in expertise and first-hand knowledge of Rhinehart's condition does not mean that he could *not* have reasonably disagreed with Schachinger's recommendation, it does cast further doubt on the idea that denying the TIPS reflected a mere good-faith difference of opinion among doctors based on genuine concerns about HE.

On balance, then, I do not believe that Edelman's purported explanation suffices to preclude a rational factfinder from concluding that Edelman purposefully disregarded a known risk. To be sure, I agree that a factfinder *could* conclude at trial that Edelman denied the TIPS procedure because he was concerned about HE. But both the medical and circumstantial evidence suggests that a rational factfinder could also permissibly subscribe to Finkel's analysis and conclude that, while "[t]here may have been non-medical reasons, . . . there was no medical reason to deny" Schachinger's recommendation for a TIPS procedure and, accordingly, that Edelman's explanation was not the sincere, reasonable medical judgment that the majority takes it to be. *See* R. 263-14 (Finkel Dep. at 104–05) (Page ID #5440–41); *see also Farmer*, 543 U.S. at 842–43 & n.8. In contrast with the majority, then, I would also allow this question to be resolved the way that all genuine issues of material fact should be: by a factfinder at trial.

---

**10**It is true, as the district court noted, R. 356 (Dist. Ct. Op. & Order at 18) (Page ID #9053), and as the majority emphasizes, Maj. Op. at 37, that Stieve, who consulted with Edelman on the question, may have known more about the TIPS procedure than Edelman. *See* R. 340-1 (Stieve Dep. at 56) (Page ID #8589). *But see id.* at 118 (Page ID #8605) ("Q. Now, is a TIPS an invasive procedure, Doctor? A. It is."). But Stieve was an administrator who had never examined or treated Rhinehart, *id.* at 28–29, 44 (Page ID #8582–83, 8586), who had previously served primarily as an obstetrician-gynecologist, *id.* at 39–40 (Page ID #8585), who could not recall whether he had reviewed any of Rhinehart's medical records before agreeing with Edelman to deny the TIPS procedure, *id.* at 117 (Page ID #8605), and who could not recall the success rate of a TIPS procedure or the likelihood of a TIPS inducing HE in a patient, *id.* at 117, 143 (Page ID #8605, 8611). In short, the mere fact that Stieve consulted on the question does little to firm up the inconsistencies and shortcomings in Edelman's justification.

## III. CONCLUSION

It may be tempting to some to minimize the decency that is due to ailing prisoners, whether because history reveals more shocking punishments, or because medical care is expensive, or because they may have been convicted of heinous crimes. But the Eighth Amendment obligates us to take our commitments to those who cannot provide for their own medical care seriously. *Estelle*, 429 U.S. at 103–04. Because I believe that a rational trier of fact could conclude (1) that Stevenson was deliberately indifferent in failing to refer Rhinehart to a specialist after Rhinehart's June 2010 hospitalization and (2) that Edelman was deliberately indifferent in denying Rhinehart a referral for a TIPS procedure after Rhinehart's October 2011 hospitalization, I respectfully dissent from the majority's affirmance of the district court's grant of summary judgment on those two claims. I otherwise concur in the majority's judgments.